PRODUCERS' OIL CO. v. BUSH et al.

(Court of Civil Appeals of Texas. El Paso. March 20, 1913. Rehearing Denied April 24, 1913.)

1. MASTER AND SERVANT (§ 199*)—FELLOW SERVANTS—WHO ARE.

Employés engaged in drilling oil wells, each doing a specific part of the work, and neither having the power to employ and discharge, are fellow servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 491; Dec. Dig. § 199.*]

2. MASTER AND SERVANT (§ 107*)—OBLIGATION OF MASTER—SAFE PLACE TO WORK.

The rule that one of the nondelegable duties of an employer is to provide a reasonably safe place in which to work is subject to the exception that the employer need not keep the working place safe, when the work which the employé is employed to perform changes the condition of the place, and makes it more or less dangerous as the work advances.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. § 107.*]

3. MASTER AND SERVANT (§ 118*)—OBLIGATION OF MASTER—SAFE PLACE TO WORK.

Employés engaged in drilling oil wells were supplied with the necessary appliances, including a jet, to protect them against escaping gas. The employés were experienced and knew the danger of escaping gas, and of the necessity to use the jet for their safety. They decided while acting together that they would not make use of any jet. While the work progressed gas escaped, causing the death of one of them. *Held*, that the employer was not guilty of any breach of duty to furnish a reasonably safe place in which to work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 177, 202, 209; Dec. Dig. § 118.*]

4. MASTER AND SERVANT (§ 217*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

An experienced employé in drilling oil wells who knows of the danger of escaping gas without using a jet, and who continues in the employment without using jet furnished by the employer, assumes the risk of injury by escaping gas.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

5. MASTER AND SERVANT (§ 185*)—INJURY TO SERVANT—LIABILITY OF MASTER.

Where employés engaged in drilling oil wells were supplied with necessary tools, including a jet to protect them from escaping gas, and it was the duty of one of the employés to make use of the jet whenever necessary, the failure to make use of the jet at the proper time to avoid danger from escaping gas, causing the death of a coemployé, was a breach of the duty of the employé, for which the employer was not liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 385–421; Dec. Dig. § 185.*]

Error to District Court, Harris County; J. A. Read, Special Judge.

Action by Lenora Bush and another against the Producers' Oil Company. From a judgment for plaintiffs, defendant brings error. Reversed, and rendered for defendant.

Jas. L. Autry, Robt. A. John, and Hutcheson & Hutcheson, all of Houston, for plaintiff in error. John Lovejoy and J. W. Parker, both of Houston, for defendants in error.

McKENZIE, J. Plaintiffs, Lenora Bush and Julia Rossie Bush, minor, brought this suit against the Producers' Oil Company and the Texas Company to recover damages for the death of the husband and father, respectively, of plaintiffs. The amended petition upon which the trial was had charges, in substance, that the appellant was a private corporation of the state of Texas, engaged in the business of prospecting for and developing petroleum oil in Humble, Tex.; that while said Bush was in the discharge of his duty as helper, working for the defendant, he was poisoned by inhaling gases, and as a consequence thereof died; that Hessig, with whom plaintiffs' decedent was working at the time of his death, was foreman of the work, and had been given the authority to employ and discharge helpers, which constituted him a vice principal of the defendant in the work of drilling wells; that defendant knew, or should have known, that

poisonous gases would escape from the well being drilled, and that such gases were dangerous, and that that portion of the Humble oil field in which the well was being drilled contained an extraordinary amount of gases which were unusually poisonous and dangerous; that persons and corporations engaged in the business of boring wells for petroleum oil of the said field and in the other fields of the said state and elsewhere, and especially in the locality where the said well was being drilled, for the purpose of safeguarding the lives of their employés, use and have customarily connected with the wells pipe or pipes to convey the gases escaping from the wells far enough away so that they would not come in contact with the men or would mix steam therewith so as to render the same innocuous, and that, when a well was known to be producing gas in sufficient quantities to endanger a human life, the foreman of the men engaged in the work of drilling would give notice to the men of such a fact, to the end that they might protect themselves against injury therefrom, and the duty to pipe away the gas or to otherwise get rid of same, and to give warning, as aforesaid, was one which rested on the owner or proprietor, and, in this case, was a duty of the defendant and its said vice principal; that it knew that the well was not provided with such means, and knew or ought to have known that dangerous gases would escape, and that Bush was inexperienced in the work of drilling, and was ignorant of danger incident thereto, and was especially ignorant of the increased danger on account of unusual gases in that part of the field; that the death of Bush was caused proximately by the carelessness and negligence of defendant and of its vice principal, Hessig, in that having knowledge of the danger it did not provide against or give Bush timely warning. The appellant answered by general demurrer, general denial, and specially pleaded the defenses of contributory negligence and assumed risk, and negligence of fellow servant, the risk of which was assumed by the decedent. During the progress of the trial, the Texas Company, having been made a party defendant, was dismissed from the suit by plaintiff. Upon trial the jury found verdict for appellees in the sum of $12,500, and judgment was accordingly entered against appellant for that amount, from which judgment the appeal is taken.

Because of the disposition to be made of this appeal, we quote at length the material testimony of the witnesses bearing upon the issues upon which we predicate our opinion.

George Hessig, the only eyewitness of the accident, testified for the plaintiff in substance as follows: "Am 45 years old, and reside at Humble, Tex. Am an oil well driller and have followed that occupation for 25 years, and have worked in the oil fields in every state in the Union where there are or have been oil fields of importance, following that occupation. Have been in the employ of the Producers' Oil Company about 14 months. Have worked in drilling wells both as helper and driller or foreman. Altogether I have worked about five years as helper and the other time as driller. In my operation in oil fields I have had experience with gas in drilling wells, as a man would ordinarily have that has been in the business as long as I have. I have had much experience with gas, and am familiar with the indications which show the presence of gas in a well being drilled, and I am familiar with the effects of gas upon persons working at or around wells from which gas escapes. * * * The manner in which gas is indicated in wells is this: The gas rises to the surface out of the wells, and you can see the gas and smell it. If the volume is pretty large, you can see the gas for several hundred feet and can smell it that far; it all depends on the volume of the gas. If any gas is escaping from a well that would be at all dangerous to those working around it, it can be seen with the eye in the daytime and smelled. I have also heard in a number of wells the gas escaping. There is no other way that I know of by which gas can be indicated in a well, except by seeing, smelling, or hearing it. If gas is in a well in a dangerous quantity to those working at or around the well, it can be smelled. A very small amount of gas in a well can be detected by the smell. Gas makes its escape from wells in this manner: It rises to the surface, sometimes through the pipes and sometimes around the pipes. In Texas fields, especially at Humble, when casing is used, it nearly always comes out through the pipes or casing, unless it is a very strong volume when it may come out around the pipe, or even below the pipe out. As a general rule gas appears in a well suddenly, and frequently increases in volume after making its appearance. The moment you strike gas it begins to rise to the surface, and the more the volume of gas the quicker it comes out. The effect upon persons coming in contact with gas escaping from wells depends upon the volume of the escaping gas, the suddenness it comes out and the kind of escaping gas. Some kinds of gas in large volumes you can work around all right, and other gas, or gas in other wells will put you out. I mean that a man breathing it would become unconscious almost instantly. Different wells in the same fields very often give forth a different kind of gas, some very dangerous and some not. From my experience in drilling wells in which gas has appeared, and from my operations in same, the appliance generally used for the purpose of avoiding danger to those employed in and about the well for the escape of gas is what is known as a jet. A jet is a piece of pipe connecting to the top of a casing in a well, ex-

tending out to the side of the well to a distance. The distance it extends will depend upon the volume and dangerousness of the gas. This jet is .connected to a .steam line, and the steam draws the gas out through the jet. * * * Where I have used it and seen it used,. it has proven satisfactory, and will take the gas away from the well. I am familiar with the use of such appliances and the necessity for their use and the indications of the necessity of their use as a precaution to avoid danger. The Producers' Oil Company during the time I worked for them had available for use such appliances * * * for the prevention of the escape of gas in a dangerous way. I was acquainted with this fact. Such appliances could have been gotten by me and used by me whenever I desired by getting them from the warehouse at Humble of the Producers' Oil Company. I did know Tom Bush. * * * I first met him about two days before his death, when he came to help me at night on a well at Humble. I only knew him about two days before his death. He had been my helper in the work of drilling wells only one or two nights prior to the night he was killed. I was foreman of the drilling crew, and he was my helper. Tom Bush and I alone constituted the drilling crew on well No. 109, which was being drilled with cable tools on the night of January 3, 1909, for the Producers' Oil Company. We commenced to work about 7 o'clock at night. At the time we began to work that night we began to side track the bit which had been broken off in the bottom of the hole a day or two before that. I mean by side tracking the bit putting on another bit to the cable tools and drilling on by the bit which was broken off. The hole was making some gas. I am now referring to well 109. * * * I did not consider that the gas was of such character and amount as to be dangerous to work around. On account of the bit being broken off in the well, our drilling was very slow; that is, we couldn't make much progress. The well was down about 1120 some odd feet at that time, to the best of my remembrance. It had been making a little gas the night before when we quit work, and the gas had increased during the following day a little, while the other crew was working. * * * There was nothing unusual about our work in drilling, and we were just doing the ordinary routine of work in drilling an oil well. I was working all the time close to the hole handling the temper screw which controls and regulates the drilling or cable tools. Tom Bush was looking after the machinery and the rig, which was his duty. We were drilling along on the well that way, making pretty poor progress all the time, until he was killed. Of course, we stopped for the noon hour at night. That night was the second or third night we had worked on the well together. Tom Bush was killed at 2:30 o'clock that night. What

caused us to stop work on the well was that we were overcome by gas. Tom Bush had started to tie the slack back to the bull wheel brace, and I don't think he had accomplished that when he stepped up to me and started to say something. The bull wheel brace was about 10 feet from me. Then a very strong and unusual puff of gas came out of the well, and Tom Bush turned, and ran about 30 feet from the derrick, and then turned around and ran back to the sand wheel. The sand wheel is located about 30 feet from the hole, between the hole and the engine. * * * He fell there and I went to pick him up, and picked him up and shook him, and he struggled with me, and I couldn't do anything with him, and I was overcome there by the side of him. * * * I do not remember any conversation that occurred between Tom Bush and myself before we went to work on the well that night; the gas being pretty strong and poisonous, I asked him if he had ever handled anybody that was ever knocked out with gas, and he said, 'No.' I then went on to explain to him what he should do for me in case I should be overcome by gas, because, I told him, being the closest to the well myself, I thought I was the one to be in danger, if any danger should happen, though I didn't think the well was dangerous at all. He said he would do what I told him. We talked about other things, of course, but that is all I remember that we said about the well. We discussed the escape of gas from the well, and I remarked that, if it got any worse, there would have to be a jet on there next day, but we both agreed that it wasn't necessary at this time. * * * These conversations which I have attempted to give in answer to the last question occurred between 7 o'clock and midnight of the night he was killed. I could not come nearer to the time than that. I spoke to Tom Bush about the gas, and we talked about the gas because the gas was unpleasant, and because I had had an unfortunate experience with gas a short time before that. We did not talk much, because his duties generally did not require him to be close to me, and I had to be on the derrick floor all the time where the gas was strongest. Prior to the blowout there had been no perceptible increase in the volume of gas or the odor since we had gone to work that night. * * * We could smell the gas pretty strongly, but my experience did not lead me to think it was dangerous at all. The atmosphere was very heavy that night; it was a dark, stormy. night, and that kind of an atmosphere holds the gas pretty close to the ground. It was not an unusual flow of gas for that field, but it smelled very poisonous, but I didn't consider it dangerous, and nothing but a blowout made it so. The presence of gas did not excite in me any apprehension of danger, because I was satisfied that, while it didn't get any worse, we

were perfectly safe. I have already stated all the directions I gave Tom Bush * * * because he was in a position to be away from the well, and only had occasion to be there at certain intervals when I wanted to pull the tools out or something like that. I told him to pick me up and shake me if the gas should get hold of me. I also told him that if the gas got any stronger, we would have to have a jet on the well. * * * The work was done just as any ordinary well drilling work was done; there was nothing unusual in it. Tom Bush had his duties and I had mine. I did the drilling, that is, ran the tools in the hole to do the drilling, and hitched onto the screw by clamping the rope or cable, and had charge of the throttle and reverse lever which put all the machinery in my control. My duties kept me on the derrick floor close to the well, with the throttle in my hand practically all the time. * * * Bush's duties, as his part of the work, were to guide the tools into the hole when I started them into the well. To do this he had to be on the derrick floor part of the time and catch the tools with his hand and guide them into the well. * * * He also had to look after the oiling of the engine, keep the slack tied back, that is, keep the rope tied back to the bull wheel brace, throw on the bull rope, and help unhitch and take down the beam, and run the engine while pulling the tools out of the hole. While I was drilling he had nothing to do but oil the engine; most of the time, he didn't have anything to do; he was there to help me when I wanted something done. Prior to the blowout, the gas escaped from the well in a regular flow, and did not come out in puffs; it was just a regular leak; * * * it did have a perceptible odor; it had a blinding effect upon the eyes if you got in the current of the gas. * * * He (Bush) was only engaged on the derrick floor in keeping the slack tied back, and throwing on the bull rope and helping unhitch and take down the beam, when I was pulling the tools out of the hole, and this had occurred only twice that night and required his presence on the derrick floor about 20 minutes each time, and he had been on the derrick floor that night not more than an hour all together. The accident occurred after we had run the tools in the hole the third time. Outside of the hour he had been on the derrick floor, he had been, the rest of the time, off at the engine or in call of me. Bush, when the blowout occurred, was standing almost north of the hole, and the wind was blowing right toward him, from the well, he was to the windward of the well; he was not more than two feet from the well at the time of the blowout. * * * At the time of the blowout, Bush was attempting to tie the slack rope to the bull wheel brace—that is, he had started to do that and had the rope in his hand—and had just started also to say something to me when the blowout occurred. I had just called him in to attend to tying the slack rope. * * * The blowout was just a sudden puff of gas; it did not make any noise, and did not move the tools at all or shake the derrick. I could see that the volume of gas had all at once increased very unusually by the lights that we had around us, and the smell was suffocating all at once. I don't think I had to tell him, Bush, or told him how to do his work at all, as he had had experience, and knew generally what he was expected to do, unless there was something special which I wanted done. He had had experience before he worked with me, and knew what was to be done by him. I knew that he was experienced by the way he went ahead and did his work. The escape of the gas, prior to the blowout, was perceptible and known to both me and Bush, and I did speak to Bush about the matter as I have stated. Bush seemed to be familiar with his work, and to know the duties of it, and to know how to perform them."

A. J. Smith, an experienced driller in the Humble field, was the day driller on well 109, testifying on behalf of the plaintiff as follows: "My drilling operations have been confined out there to property in the Humble oil field during the five years I have been with the Producer's Oil Company, and I have drilled a good many wells. In a general way the extent of the holdings of the Producers' Oil Company in the Humble oil field are large; they have a good many acres of land under lease up there which they are operating on for oil. * * * Each well of the Producers' Oil Company in the Humble field is numbered. The number of the latest well—that is, the one I am working on now— is 89 on the Hermann lease. The number of the well on which Tom Bush lost his life was 109. The wells on each lease are numbered separately. I cannot answer anywheres the number of oil wells that have been put down by the Producers' Oil Company at Humble. I have no idea, but there have been a great many. * * * I did work the day before the death of Tom Bush; we ceased work about 5 o'clock that evening, and Mr. Hessig came on after we quit work. Tom Bush, his helper, came after I left. I saw Mr. Hessig that evening a little west from the well No. 109. I had left the well to get away from the gas, and Hessig, when I met him, was going to the well to begin his work. I spoke to Mr. Hessig, and told him I didn't believe they could work on that well that night because the gas appeared to be so bad; that I had shut down because it was making my eyes sore. He wanted to know what he should do and I told him I had nothing to say, it was up to him, that he had charge when I left. I thought that, before work was resumed on the well, he (Hessig) would have to put on a jet to take the gas away. It was the duty of either Mr. Hessig or my-

self to determine when a jet should go on a well that was making gas; the foreman did that. Those jets were kept right at the warehouse; lots of times there would be material enough around the rig to make one and put it on. I stated I quit that evening at 5 o'clock; that was a little early, but I quit because the gas was hurting my eyes. The reason I didn't put a jet on was because the gas didn't commence to get bad until late in the evening; that is, enough so as to make it dangerous to work by. There was no jet right at that well; I went to the warehouse the next morning and got the material, made a jet and put it on the well. I had not during that day made any request of any one for that jet, at no time during the day did I do that, but I got one next morning and put it on the well. After putting on that jet, I again went to work on the well, and we finished the work on that well. I will describe to you a jet: We would put a tee on the top of the casing, and then we would screw another joint of pipe in beside of the tee, bring it outside of the derrick, put another tee on, and put an upright pipe to it, and bring the jet up from the inside, from the bottom, connect up, and then we would blow it with steam. * * * The object in removing the gas in the manner I have indicated was to make it safe for men to work on the well. The oil stratum in the Humble field was reached at various depths; the shallowest well that I worked on was 1,148 and the deepest was 1,185 feet; 1,148 was the shallowest one that I have ever drilled in, but then I have drilled in wells where the oil bearing strata was deeper than 1,200 feet; that was considered to be the same stratum as I am speaking of; but it varied just that much, as I have stated to you. Ordinarily the oil bearing strata was reached between the two depths I have mentioned; that is, between 1,148 feet and 1,185 feet. I cannot tell you what the depth was of the well No. 109 at the time of the accident to Bush, but it was something over 1,100 feet. We had not at the time reached the oil rock. In drilling out there we used cable tools; the cable tools were used for drilling the wells in, but we used the rotary for drilling wells. This well No. 109 was drilled with a rotary process to along about 1,100 feet. * * * At the time of the death of Bush, we were using cable tools. We had been using the rotary process up to the time they set the casing; I had nothing to do with that part of it; they set the casing and I drilled them in from the casing down. * * * We would find the gas at different depths when putting down a well with cable tools. * * * It doesn't necessarily follow that the gas is at the same place in the ground, not all the time it isn't. * *. * Sometimes the gas in the Humble field comes in puffs, sometimes it comes gradually, steady right along. * * * There was gas showing up in the Humble field just about the time when Bush was gassed; prior to that time there had been considerable gas, and each year, starting from the beginning of the field, the gas apparently got less. * * * It was a common topic of conversation among the men out there that it was dangerous to be about a well that was gassing, and it is a fact that it was generally understood that, if a person was working about a gassing well, they took a chance of being gassed. It is also a fact that the nature of the gas was such by the smell of it and the action of it, that anybody with average common sense is bound to know the gas was dangerous. * * * A person can work in that gas, and it will not affect his breathing, but it will make his eyes sore; he can't work in the gas without knowing it is there because his eyes will smart; is the eyes will always tell him the gas is there if he is in it any length of time. The gas in the Humble field has an odor; you can detect it by the smell. * * * At the time I left the well the gas had showed itself to the extent that it was smarting my eyes, and I told Hessig that I didn't think he could work on the well. * * * I have seen gas come out of a well in a sudden great volume, with a sudden puff; when gas comes out that way a gas jet will not always stop it, if the volume of gas is too great a gas jet would not stop it. * * * A certain amount, if the puff is too strong, is bound to go by the jet. * * * It is a fact that if a gas jet is put on the well that the driller is the man who determines when it shall be put on. It is also a fact that the driller, in connection with his helper, fixes up the jet and attaches it to the well. It is likewise a fact that the Producers' Oil Company furnishes for our use, whenever we want them and instructions to use them whenever they are necessary, such tools and appliances as may be necessary to make this jet, and we can get them whenever we need them. I have drilled in wells without putting a jet on them. It is a further fact that the jets are used, not only to prevent danger to human life, but for the purpose of preventing the gas from smarting the eyes of the workers, to that extent, and very often wells are drilled entirely in even when there is gas showing and no jet is put on. There is no uniform rule in the field, or custom, that just as soon as gas shows up in a well they shall put a jet on; there is no necessity for that. There is no necessity for a gas jet unless the well shows gas in a very considerable volume, and there is no way a man can tell, unless he is working on the well, in advance when he is going to use a jet, or whether he is going to need it at all. It is a matter up to the driller and his crew on that well, on each particular well, from the conditions which appear from time to time on the well, to determine the question of the

necessity of the jet, to put it on himself, if he finds it necessary. * * * When you start a well in the Humble field at the surface of the ground, there is no sort of odor from gas; there is no danger from gas. * * * When a man sets up his rig and commences his work, starts his drill down, there is no question of gas, there is no sort of danger from the gas, not at the start, and whatever danger there is of gas arises during the progress of the work. I don't believe the presence of gas makes itself known in all wells at the same depth and under the same conditions; it does not where you are drilling in with cable tools. We find it at different depths. As to whether or not gas appears in wells in the same quantities and in the same way in all wells, it don't appear in the same quantities, it comes gradually in some and suddenly in some; it comes in all kinds of ways in different wells, * * * and I can't tell when I set my derrick up and start to drill; there is no way to tell when you are going to find the gas or how it is going to show up or anything until you get down to it and it comes. * * * I had seen gas in other wells there to the extent that the gas was in well 109 when I quit work. As to whether I have ever seen it in any other part of the field than this place or whether it shows up practically the same in different parts of the field, will state that it was practically the same, some places there was more than others. * * * It appeared to be spotted. * * * Out of one well you might get a little bit of gas, and the well alongside of it you might get but a very little, and then sometimes none, that is what I mean by spotted, that I never could tell whether you were going to get gassed or not, that is it. It was the understanding that every man that worked in connection with drilling in a well in the Humble oil field was bound to know that he was running a chance of being gassed when the well came in. I drilled other wells in this locality besides 109. I don't remember whether gas showed up in them; if there was, there wasn't enough to cause any trouble in any way; this was the only well in that locality that had shown up practically full of gas. I had drilled other wells close to this one. * * * I should judge that it couldn't have been over 50 or 60 feet. I don't remember whether I got much gas in that well, there wasn't enough I know to cause any trouble. * * * We didn't put any jet on the well. Now in other portions of the field * * * that same kind of thing happened, that I would drill a well at one place and get no gas, and right next to it drill a well and get gas. This part of the field was no different in regard to gas than in other portions of the Humble field that I could notice that I had to drill in."

W. H. Lyne, a witness for the defendant, and an experienced man in the Humble field,

and vice president of the defendant company, testified that the Producers' Oil Company had every up-to-date appliance known to the business of drilling oil wells, and keep such appliances in stock at the warehouse, and that such appliances are furnished to the men as they need them. In the Humble field two or three different stratas of gas are struck. When the well is first started there is no gas. As the drill goes down, the first strata in some parts of the field is at 300 feet, and the largest flow of gas is generally struck at about 800 feet. "We cannot drill wells there in that field and not get gas; we get some gas in every well that is drilled. You can't anticipate as to how much gas there is; we don't know where we are going to strike it, and, as to knowing what depth, there is one gas strata that is pretty well defined throughout the field at about 800 feet; beyond that we don't get any gas until after we set the casing, then we start drilling in the well, then we get the sulphuride gas. When the gas appears in the well, * * * and it does more or less, the necessity of using a gas jet to protect the workers against that gas does not arise; that is, not inevitable at the time of the injury * * * to Bush. * * * I don't think we had used a jet except on four wells, drilling in of four wells. * * * I think four jets only on four wells would cover it."

[1] Other testimony shows conclusively that Bush and Hessig were engaged in the drilling of the well and were fellow servants, in that Hessig was not intrusted with the power to employ and discharge, and that Bush had worked in the Humble field for about five years, and had been in the employ of the Producers' Oil Company for some time and was experienced in the work for which he was engaged and knew the conditions as to the gases escaping from wells being drilled and the dangers which result therefrom. The testimony is that Bush was himself at one time overcome by gas, and had worked around wells when others were overcome by gas.

There is no dispute, then, that at the beginning of the work of drilling the well the place of work was safe, free from all gases and the danger therefrom. The necessary tools and appliances for drilling the well and for keeping the place of work safe in drilling the well were furnished and were of the proper kind. That in doing the work of drilling the well Hessig and Bush were fellow servants, and that each was experienced and competent to perform the duties of their respective positions. That at the time of accident each was engaged in doing the ordinary work pertaining to the duties of their employment.

It is shown by the evidence that in drilling a well in the Humble field different stratas of gas are encountered, the respective stratas varying somewhat as to depth, but the quantity of gas encountered in a well being quite

variable; that is to say, in some of the wells drilled the gas encountered would be inappreciable in quantity, while in others in practically the same part of the field the quantity of gas would be much greater. This condition as to the quantity of gas to be found in a well was practically the same throughout the Humble field. In a few of the wells drilled in the Humble field the gas encountered was poisonous and dangerous to work around, while in the great majority of the wells drilled the gas encountered was not considered dangerous to work around. Where gas was encountered of a quantity and of the poisonous kind which made it dangerous to work around, a jet was the proper appliance to be used to avoid the danger. Of the great number of wells drilled in the Humble field by appellant company, it became necessary to use a jet only on four during the progress of drilling. It was the duty of the driller to determine when the use of a jet became necessary; and, when once determined, it was then the duty of the helper to assist the driller in placing it upon the well. The custom in drilling wells in the Humble field was that the jet was not to be placed on the well until the condition as to the escaping gas made it dangerous to work around. Bush knew of this custom and the condition of the escaping gas from the well, and knew its dangers immediately before the fatal accident. He and the driller had discussed the condition existing and both agreed that the jet was unnecessary at that time. At the time of the accident Bush was at the well tieing the slack of the drilling rope to the bull wheel, but before accomplishing that duty he approached to within two feet of the well and to the windward side thereof engaging the driller in conversation, when a puff of poisonous gas came from the well, which caused his death. The scope of Bush's employment required him to tie the slack rope to the bull wheel, and the puff of gas which caused his death was encountered and brought about during the progress of drilling.

[2] A familiar rule of law is that one of the nonassignable duties of the master is to provide his servants a reasonably safe place in which to work. Like other general rules, this one has its exceptions, and one exception is that the master is not under duty to keep the working place safe when the very work which the servant is employed to perform changes the condition of the place and makes it more or less dangerous as the work advances.

[3] It is shown by the evidence that in the beginning of the work the working place was safe, and became unsafe only as the drilling progressed. The work was such that it might be said that at each stroke of the drill the safe place of work was likely to change. All necessary tools and appliances for drilling the well and for keeping the working place safe were furnished by the appellant and were of the proper kind. Hessig, who was Bush's co-worker in the drilling of the well, is shown to have been an experienced and competent employé. The condition as to the escaping gas and of its dangerous character was known to both. Ordinary care, under the conditions as shown by the evidence, would require that the jet should have been placed upon the well for their own safety, but, after discussing this very condition, Bush and Hessig acting together in that matter, it was decided by both that they would not make use of the jet at that time. Bush was participating in the work at the time of the fatal accident, and his duties necessarily called him in immediate proximity to the well on frequent occasions. The situation, then, in which Bush placed himself, and of which the very nature of the work that he and Hessig were engaged in, constitutes an exception to the general rule that the master must furnish the servant a safe place in which to work. The danger encountered was brought about by the very work which they were doing, and it being shown by the evidence that the appellant had done all which the law required of it, and not being guilty of any breach of duty for which it is even prima facie liable, we are of opinion that appellee should not recover. 2 Labatt on Master and Servant, § 588; Smith's Adm'r v. North Jellico Coal Co., 131 Ky. 196, 114 S. W. 785, 28 L. R. A. (N. S.) 1266, and subject note; Miller v. Berkeley Lime & Stone Co., 70 W. Va. 643, 75 S. E. 70.

[4] Independent of the fact that the evidence shows that appellant had done all which the law required of it, and had not been guilty of a breach of duty toward its servants in drilling the well, we are of opinion that the evidence further shows that Bush came to his death by a danger and risk which he assumed. It conclusively appears from the evidence that Bush was an experienced man, had worked in the Humble oil field for several years, knew the danger from gas escaping from the well under the circumstances, and knew that a jet was a proper appliance, which, if placed on the casing of the well, would have kept the place of work safe. He and Hessig had discussed the condition of the well as to the escaping gas, and as to whether or not they should use the jet upon it. This discussion took place just prior to the accident, when the gas that was escaping was smarting the eyes, and had a poisonous odor. It thus conclusively appears that Bush knew that there was more or less danger in working at the well without the jet when the gas was escaping therefrom in the volume and of the noxious character as was shown in this instance. Knowing all these facts, by continuing in the employment and remaining at work around the well, Bush thereby assumed the risk or danger brought about by the absence of the jet, and the question as to negligence

on the part of appellant in not having placed the jet upon the well would not affect the question.

In 1 Labatt on Master and Servant, p. 639, the general rule is thus stated: "A servant who, either before or after he commences the performance of the contract of employment, has ascertained, or ought in the exercise of proper care to have ascertained, that the ordinary hazards of his environment have been augmented by abnormal conditions produced by the negligence of the master or of his master's representative, and has accepted or continued in the employment without making any objection and without receiving any promise that the abnormal conditions will be remedied, is deemed as a matter of law to have assumed the risk thus superadded, and to have waived any right which he might otherwise have had to claim an indemnity for injuries resulting from the existence of that risk." From the evidence it would appear that Bush was informed and understood the conditions, as well as the obvious danger, and assumed the risk, and appellees should not be allowed to recover.

[5] We are of opinion that the duty of determining when a jet should be used upon a well was a mere detail of the work. This is necessarily true when we consider the character of work which was being done. It is shown by the evidence that the invariable custom when drilling wells in the Humble field was to leave the jet off of the well until, in the progress of the work, gas should be encountered in such quantity and of such poisonous character as to make the place around the well dangerous. Of the large number of wells drilled by appellant in the Humble field, it was necessary to use the jet only in a few instances. The evidence is to the effect that appellant furnished the jet, which was a proper appliance, and had it been used upon the well at the proper time the accident which occurred would necessarily have been avoided. It is also shown by the evidence that the character of the work was of such a nature, and the use of the jet was so dependent upon the character of work, that the servant in doing that work was required as a matter of duty and as servant to use the jet when it became necessary, and in making use of the jet the servant was not the alter ego of the master. So it may be said that the failure to make use of the jet at the proper time to avoid the danger which was apparent was a dereliction of duty on the part of Hessig, who was the fellow servant of Bush, for which appellees could not recover. As said in 2 Labatt on Master and Servant, § 604: "Another kind of dereliction of duty which is regarded as characteristic of a servant and not of the master is that which consists in the failure of a fellow servant to make use of a suitable appliance furnished by the master for the work in hand." On account of the infrequency of the appearance of gas in such quantity and of such dangerous character, and because of the very nature of the work, it certainly could not be said that the master should stand by for the purpose of determining when use of the jet was necessary in order to avoid the danger which would likely be encountered by the very work which was being done by the servants themselves.

The questions which we have discussed are properly raised by appellant's brief, and for the reasons as herein indicated we are of the opinion that this cause should be reversed and the judgment here rendered for appellant.

Reversed and rendered.

HIGGINS, J. (concurring). Under the evidence in this case, the jury was authorized in finding that the defendant, in the exercise of ordinary care, should have foreseen the probable escape of gas from the well in such volume and of such poisonous nature as might be dangerous to the life of its employés engaged in drilling the same; that there was an appliance known as a jet, which if attached to the well, would have conducted poisonous gases therefrom and rendered the same a safe place to work; and that without this jet being upon the well it was not safe. I am therefore of the opinion the evidence supports the jury's finding that appellant was guilty of negligence in failing to have the well equipped with such jet. The duty of making the place safe was nondelegable, and the failure of Hessig to place the jet upon the well was the negligence of the master, since in the performance of nondelegable duties a fellow servant is in that respect regarded as the representative of the master.

The rule referred to in the majority opinion, is believed to be inapplicable which relieves the master from the duty of exercising ordinary care to provide a reasonably safe place to work in cases in which the very work in which the servant is employed is of such a nature that its progress is constantly changing the conditions as regards to increase or diminution of safety, and that the hazards thus arising as the work progresses are regarded as ordinary risks incident to the employment, and are assumed by the servant. The authorities which recognize this rule chiefly refer to construction, mining, and excavation work, and the rationale of the rule is that, under such circumstances and in the very nature of things, the master in advance cannot provide for the safety of his servants, and that provision for such safety cannot be made except as the work progresses and when the danger arises. The text-writers and authorities treat this as an exception to the general rule which imposes upon the master the duty of providing a safe place to work, but as a matter of fact, when analyzed, it is not an

exception, but recovery is denied on the broad ground that there is no breach of duty on the master's part. Necessarily there can be no negligence and breach of duty on the part of the master if provision for the safety of his workmen cannot be made in advance, or if a condition or situation is created as the work progresses, whereby a danger arises which can only be safeguarded against by the workmen then and there employed in the work.

In the instant case, however, it appears gas had been uniformly encountered at various depths in drilling wells in the Humble field, and the master therefore knew that at some time during the progress of the work gas would be encountered which might be in such volume and of such noxious character as to render same dangerous to those engaged in drilling the well. The jet which would have carried the noxious gases away was an appliance which would have rendered the place safe to work, and it could have been placed upon the well when drilling first began, or at any time prior to the appearance of the gas. It would in no wise have interfered with the work, and would have been there ready for use whenever the gas was encountered. Therefore the master could have and should have provided a safe place for the decedent to work; and, the reason for the rule referred to in the majority opinion failing, the rule itself would not apply.

My views upon this subject might be elaborated at greater length, but it is unnecessary to do so, since I concur in the view that it conclusively appears the decedent was aware of the danger attached to working around the well without the same being equipped with a jet, or was legally chargeable with knowledge thereof, and he therefore assumed the risk incident thereto, wherefore appellees are precluded from recovery herein.