ADAMS v. CONSUMERS' LIGNITE CO.

(Court of Civil Appeals of Texas. Dallas. June 10, 1911.)

1. MASTER AND SERVANT (§ 208*)—OBLIGATION OF MASTER—SAFE PLACE TO WORK—ASSUMPTION OF RISK.

The rule that a master must exercise ordinary care to furnish a servant a reasonably safe place to work does not apply where the place becomes unsafe during the work as it progresses, the resulting hazard being one which the servant assumes.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 551; Dec. Dig. § 208.*]

2. MASTER AND SERVANT (§ 124*)—INJURY TO SERVANT—EVIDENCE—INSTRUCTIONS.

Where, in an action for injuries to a coal miner by material falling on him while removing coal in a pillar to support the roof of the mine the evidence showed that the place, when the miner began to remove the coal, was safe, that he knew of the dangers of the work as it progressed, and knew that in pulling pillars the roof was liable to become unsafe, a charge that if, in the progress of the work, the roof became unsafe, the master was not responsible, and was not required to inspect the same, properly stated the duty of the master, under the evidence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

3. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—PROPOSITIONS—STATEMENTS.

An assignment of error complaining of an instruction will not be considered where there is not subjoined to the propositions urged under the assignment such a statement as is necessary to explain and support the propositions.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

4. MASTER AND SERVANT (§ 217*)—INJURY TO SERVANT—ASSUMPTION OF RISK—EVIDENCE.

Where a servant appreciated the danger before he was injured, while at work, it was immaterial whether he acquired the knowledge from a coemployé or from the master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

Appeal from District Court, Wood County; R. W. Simpson, Judge.

Action by J. T. Adams against the Consumers' Lignite Company. From a judgment for defendant, plaintiff appeals. Affirmed.

Jones & Jones, for appellant. Walter F. Seay and Harris, Britton & Suiter, for appellee.

TALBOT, J. This suit was instituted by the appellant against the appellee to recover damages for personal injuries received by falling dirt, slate and coal from the roof of appellee's coal mine, while appellant, as an employé of appellee, was working in said mine. The mine was divided up into compartments which are called "entries" and "rooms." In taking out the coal or lignite, the employés would begin at the face of the coal in the entry and dig back opening up "rooms" about 15 feet wide. Between the rooms a solid wall of coal called a "pillar" is left which supports the roof. After the coal is taken out and the rooms formed, holes are then cut through the pillars, and the coal for a space of several feet is removed, still leaving, however, a portion of the pillar called a "stub" to prevent the roof from caving in. After removing all the coal in the rooms and pillars except that constituting the stub, the stubs are mined and the coal in same taken out. This is dangerous work, and is called "pulling pillars or stubs." On the 27th day of April, 1909, the appellant was engaged in removing the coal of a stub near an entry, and while so engaged dirt, slate, and coal fell upon him from the roof above and injured him. The evidence is conflicting as to whether appellant was an inexperienced miner, and as to whether or not the appellee had warned him of the dangers incident to the work in which he was engaged. The grounds of negligence alleged on the part of the appellee, are, in substance, that appellant being an inexperienced miner, which was known to appellee, was directed by appellee's foreman, E. E. Breedlove, who had authority to hire and discharge, to do the work he was engaged in when hurt, without warning him of its dangers; that appellee's said foreman informed appellant that the place where he was put to work was a safe place, when in fact it was a dangerous place, all of which was known to appellee and unknown to appellant; that if appellee did not know at the time appellant was put to work "pulling the stubs" that the roof above him was dangerous, then a proper inspection of it would have disclosed its dangerous condition and such inspection was not made. The defendant answered by general demurrer, general denial, assumed risk, contributory negligence, and charged that the plaintiff had placed a blast in the room where he had been working the day before; that said blast was placed too near the roof, and that when the same was fired off the coal which fell upon plaintiff was caused to drop away from the roof; that the placing by plaintiff of the blast too near the roof of the room was the cause of the coal falling upon plaintiff, etc. The case was tried before a jury, and resulted in a verdict and judgment for the appellee, from which this appeal is prosecuted.

The court, among other things, instructed the jury as follows: "It was the duty of the defendant to use ordinary care to furnish to the plaintiff a reasonably safe place in which to work and to use ordinary care to inspect such place. If, however, in the progress of the work in which plaintiff was engaged, the roof became unsafe by reason of the work being performed by plaintiff, then defendant could not be held responsible for such unsafe condition, if any, of the roof, and was under no obligation to inspect the same." That portion of this

charge which informed the jury that if, "in the progress of the work in which plaintiff was engaged, the roof became unsafe by reason of the work being performed by plaintiff, then defendant could not be held responsible for such unsafe condition, if any, of the roof, and was under no obligation to inspect the same," is objected to and made the basis of appellant's first assignment of error. The court did not err·in giving this charge.

Appellant testified: "A pillar or stub is just a lot of coal that is standing holding up the top of the mine. 'Pulling' pillars means taking the pillars out from under the top of the mine. The coal had been dug away from both sides of that pillar. A pillar is made of coal, and the coal is dug from each side away from the pillar, the pillar stands there by itself. The coal had been dug out on each side, but there is another pillar a certain distance from that pillar. The wall between two rooms is what I mean by a pillar, in other words, it might be called a partition like, that runs from the bottom of the mine to the roof of the mine and holds up the top. Pulling pillars is digging the coal down and loading it on the cars. You take the pillar of coal out of there. The pillar consists of coal that is taken out. I had been engaged in pulling pillars four or five days. I was pulling pillars or stubs at this time. I was pulling away the coal called a stub. Some of them call it slabbing, that is slabbing it out—taking it out. I suppose the pillar coal is the last coal you take out of a mine, for whenever they pull these pillars it lets the roof all in. I was hurt about 1:25; between 1 and 2 o'clock some time. I was working on a stub. I think I put a blast in the night before. I think I put in a couple of shots. I put those shots in the coal. I placed them in a pillar; placed one of them in a pillar or stub, and placed the other one back in a room. One of them was in the top, and the other one was in the bottom of the pillar-stub. I don't remember whether I touched those off or some of the rest of the boys. Monroe Teer might have touched them off. They were touched off; they were shot. I suppose this blast I put in the top was something like a foot and a half or two feet, straight through. When you shoot it that does not tear all the coal loose everywhere. It shatters or jars what there is loose behind. That is all I ever saw jarred loose by a shot. I told you I put in two shots. I reckon about 10 or 12 feet from where I put one of them, about 20 or 30 feet from where I put the other one where the coal fell on me."

Sam Cameron, a witness called by the plaintiff on cross-examination, testified: "As you dig the coal out of the room, or pull pillars, the whole condition changes; * * * there may be a sudden change. Of course, a man can shoot his roof and make it dangerous. It is forbidden to shoot the roof. We shot our roofs down, though, when we were pulling stubs or pillars, they allowed us to then. A man working a room, I don't think they would allow him to shoot. I did not do any room work, all the work I did was on pillars, stubs, or something like that. They have a rule not to blast roof in rooms. When he digs it from the roof the roof changes, as he digs it from the sides the sides change. Of course, in taking coal down you make the pillar or stub less; just in the natural progress of the work, the conditions there change, but a man may have gone a little distance before the conditions change. I do not mean the coal changes, but the situation—the surroundings—may constantly change. In other words, he has got a condition that with every stroke of the pick he changes it. They leave the pillar next to the end of the entry in order to hold up the entry roof. As you pull the pillar the roof falls, that is the last thing you do in that part of the mine, you might call it that I reckon. As you pull the pillar the roof comes in behind you. * * * As you pull pillars the roof comes in; in the natural progress of pulling pillars it falls in after a while."

Malcolm Cameron, brother-in-law of the plaintiff, testified, among other things, that the place where the roof fell "was four, five, or six feet possibly" from where plaintiff made the "shot" in the roof.

Ellis E. Breedlove, assistant superintendent of the defendant's mines, placed upon the stand by the defendant, testified: "In pulling pillars the roof is liable to be safe one minute and not safe the next, because that is what you are doing, you are pulling in the pillars and letting the whole thing drop through, even dropping the top."

If not conclusively established, the evidence was amply sufficient to raise the issue that the very work in which the appellant was engaged at the time he was injured was of such a character that its progress was constantly changing the situation with reference to his safety, and, as applicable to the facts, the charge complained of was a correct statement of the law.

[1] The well-established general rule that the master must exercise ordinary care to furnish his servant a reasonably safe place to work has no application where the place becomes unsafe during the progress of the work. In such case "the hazards arising as the work proceeds are regarded as being the ordinary dangers of the employment, and by his acceptance of the employment the servant necessarily assumes them." Railway Co. v. Hanson, 125 S. W. 63. Mr. Labatt, in his work on Master and Servant, § 588, after referring to the rule as it is expressed by the court of Massachusetts, says: "One special application of the general conception underlying the rule stated in the preceding section is that where the work is of such a

character that, as it progresses, the environment of the servant must necessarily undergo frequent changes, the master is not bound to protect the servant engaged in its employ against the dangers resulting from those changes." Armour v. Dumas, 43 Tex. Civ. App. 36, 95 S. W. 710; Allen v. Railway Co., 14 Tex. Civ. App. 344, 37 S. W. 171; Smith v. North Jellico Coal Co., 131 Ky. 196, 114 S. W. 785, 28 L. R. A. (N. S.) 1266.

[2] The evidence shows practically without contradiction that the place, as it stood when appellant began to remove the coal constituting the stubs or pillars, was safe, and it was not incumbent upon the appellee to stand by during the progress of the work being done by appellant to inspect and see when a danger arose and give warning of it or otherwise protect appellant from it. That appellant, however, had been informed some time before the accident occurred which resulted in the injuries of which he complains, of the dangerous condition of that place where he was at work and appreciated the danger to which he was exposed therefrom, is shown by the undisputed evidence. The plaintiff himself testified that he was hurt between 1 and 2 o'clock p. m.; that the night before he put in two blasts, one in the bottom and the other in the top of the pillar or stub, and that they were touched off; that they were shot. He further testified: "Monroe Teer told me that shot back there was dangerous, and not to go near it because it would make the roof liable to fall in. He told me that in the morning when we first went in, which I think was 7 o'clock." Again, he says: "Breedlove had put me to work about four or five days before I got hurt. I was then working right along there on that chain of pillars. I could not say how many pillars were in the chain. Monroe Teer told me that the roof was dangerous, he showed me that it was dangerous and I saw it myself up there. Then after that I came to within 20 or 30 feet, somewhere along there, of where that shot was. He showed me the roof was torn up by the blast and I could see the crack myself after he showed it to me, and after he told me and I saw the crack I realized that the place at that shot was dangerous, and that the roof was in a dangerous condition up there. At the time this coal fell and I was hurt I was working in the place that Breedlove had put me. When Monroe Teer told me that the roof was dangerous, I could look and see myself that the roof was dangerous. He showed me where there was a crack running through it. I supposed the coal was loose, it was broken, I could see that myself after he told me not to go back there that it was dangerous, I could see it." Breedlove, appellant's foreman, testified: "In pulling pillars a roof is liable to be safe one minute and not safe the next, because that is what you are doing, you are pulling in the pillars and letting the whole thing drop through, * * *

and I had cautioned them [the employés] repeatedly to watch out for the roof, that it was liable to become what we termed 'crummy' and loose and fall, and at all times to stay in the clear of it." This witness further testified: "I put him [appellant] to pulling stubs because he requested that place. I told him it was hazardous work, and I absolutely would not put anybody but an experienced man at that work, and he assured me he was experienced as a pillar puller. It is not true that shortly before the accident Sam Cameron came to me and told me that Adams was in a dangerous place pulling pillars; that he was inexperienced in pulling pillars, and that if I did not take him away from there he was liable to get killed; and that I replied that other men had been quitting the place, and that I wanted to keep Adams in there. That is absolutely not true." Under this evidence the charge was not wrong in that it submitted an issue that was not raised by evidence, and whether or not the appellee had actual knowledge of the dangerous condition of the roof, and whether or not the appellant was inexperienced in the work he was doing, and whether or not appellee knew he was inexperienced in such work and failed to warn him of the dangers incident thereto, etc., were submitted to the jury in other paragraphs of the court's charge, as issues of fact, and by their verdict, upon evidence warranting it, determined favorable to appellee.

[3] The second assignment of error complains of the fourth paragraph of the court's charge. There is not subjoined to the propositions urged under this assignment such a statement, under the rules for briefing a case, as is necessary and sufficient to explain and support the propositions. The assignment is not, therefore, entitled to consideration. We will say, however, that the questions presented are practically the same as some of those raised by the first assignment of error, and have been disposed of adversely to appellant's contention by what has been said in the discussion of that assignment. The same may be said in reference to the third, fourth, and seventh assignments of error.

The other assignments need not be discussed. None of them present any novel question, and it is sufficient to say that they have been carefully considered, with the conclusion reached that they disclose no reversible error. As a matter of fact the evidence very conclusively shows that appellant was warned of and fully appreciated the danger to which he was exposed in doing the work in which he was engaged; that in the progress of the work he was doing the roof became unsafe by reason of such work, and he is in no position to have this case reversed because of any of the matters complained of by the assignments of error.

[4] The fact that he may have been warn-

ed, and the danger made known by a co-employé, does not materially affect the question. The important question is, Did he know and appreciate the danger before he was injured? If he did, it is immaterial how he acquired the knowledge of such danger.

The verdict of the jury was warranted by the evidence, and the judgment rendered thereon is affirmed.