HORTON & HORTON v. HARTLEY et al.
(No. 6698.)

(Court of Civil Appeals of Texas. Galveston. Oct. 21, 1914. Rehearing Denied Nov. 19, 1914.)

1. DEATH (§ 13*)—NATURE OF ACTION—REQUISITES—PERSONAL DEFAULT.

Rev. St. 1895, art. 3017, cl. 2, provides that an action for death may be maintained when the death of any person is caused by the wrongful act, negligence, unskillfulness, or default of another. Held, that a person cannot be charged thereunder for the death of another, caused by the act or omission of the agents or servants of the persons sought to be charged, but only for death resulting from the latter's immediate act or omission, or for the default of some agent representing him in the performance of a nondelegable duty.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 48; Dec. Dig. § 13.*]

2. MASTER AND SERVANT (§ 107*)—DEATH OF SERVANT—SAFE PLACE—CHANGING PLACE.

The rule requiring a master to furnish his servant with a safe place in which to work, and holding him liable for injuries caused by a failure to perform such duty, does not apply to cases in which the work being done by the servant is constantly changing, requiring constant renewal of precautions against danger.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. § 107.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**3. MASTER AND SERVANT (§ 278*)—DEATH OF SERVANT—NEGLIGENCE.**

Decedent, having represented to defendant that he was competent to superintend a sewer construction gang and was especially competent to sheath and brace sewer walls as the work progressed, was employed as foreman of a gang and given charge of the construction of a section of defendant's sewer work. Defendant provided sufficient and proper material with which to brace the sides, and instructed decedent to use all that was necessary and if there was an insufficient supply at any time to demand more from defendant's teamster. Decedent was killed by a cave-in while endeavoring to brace the sides of the sewer after notice that they were dangerous, and that the sides were about to cave in. He made no attempt to escape after he was notified of the danger, but, though others had refused to go into the trench, insisted that the place was safe. *Held*, that there was no actionable negligence on defendant's part, and that decedent assumed the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ ·954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

Appeal from District Court, Harris County; A. E. Amerman, Special Judge.

Action by Evelyn K. Hartley and others against Horton & Horton. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

Andrews, Streetman, Burns & Logue and Campbell, Sonfield, Sewall & Myer, all of Houston (W. L. Cook and Leon Sonfield, both of Houston, of counsel), for appellant. John Charles Harris, of Houston (Harris & Harris, of Houston, of counsel), for appellees.

McMEANS, J. George F. Horton, doing business under the firm name of Horton & Horton, was engaged in the construction of a sewer system in the city of Houston, and P. M. Hartley, the husband of Evelyn K. Hartley, and father of Sydnia C. Hartley, was, on the 30th day of April, 1913, in the employment of said Horton, and on the date name was killed while engaged in the service for which he was employed, by the caving of earth into an excavation then being made for a sewer. This suit was instituted in the district court of Harris county by the said Evelyn K. Hartley and Sydnia C. Hartley to recover damages for his death. The grounds of negligence charged against defendant and upon which a recovery is sought are: (1) In failing to use ordinary care in furnishing the deceased a safe place in which to work and in failing to properly brace the sewer; (2) in failing to furnish the deceased with suitable material to properly sheath and support the sides of the sewer; (3) in failing to employ properly skilled workmen to construct the side planking and supporting cross timbers; (4) in failing to furnish a sufficient quantity of planking and cross timbers of sufficient strength to prevent the sewer from caving; (5) in not properly inspecting the planking and cross timbers both before and after they were placed in the sewer; (6) in permitting deceased to work in a place not sufficiently planked, sheathed, and braced; (7) in not providing a ladder or other means of escape for deceased from the sewer; (8) in not stationing a competent person to give warning to deceased of sudden danger of the earth caving in while he and his men were working in the sewer; and (9) in delegating to an incompetent and inexperienced employé the duty of furnishing a sufficient quantity of suitable timbers and planking to properly brace the sewer, and in delegating to such employé the duty of passing upon the sufficiency and quantity of timber required for use in the sewer. The defendant answered by general denial and pleas of assumed risk and contributory negligence. He further pleaded that the character of work being done at the time when and the place where deceased met his death was such that conditions were constantly changing and such that it was incumbent upon deceased and his gang to make safe their own place of work. The case was tried before a jury, and resulted in a verdict and judgment for plaintiffs for $10,000, from which the defendant has appealed.

Appellant's first assignment of error is as follows:

"The trial court erred in overruling defendant's amended motion for a new trial upon the ground specified in paragraph 1 of said motion, which is as follows: 'This being an action under the Texas death injury statute, growing out of the death of plaintiff's decedent, P. M. Hartley, and being an action against a natural person, George F. Horton, doing business under the firm name of Horton & Horton, he being the sole owner of said business, the verdict of the jury was contrary to and not supported by the evidence, for there was no evidence of personal or individual negligence on the part of George F. Horton proximately causing the death of said Hartley.'"

By his first proposition he asserts that:

"This being an action to recover damages on account of the death of plaintiff's decedent, and being an action against George F. Horton individually, it was essential to a recovery that there be evidence showing, or tending to show, negligence on the part of said George F. Horton individually, as distinguished from negligence of his servants or agents, as the proximate cause in law of the death of said Hartley."

By another proposition under the first assignment he contends that, there being no evidence to sustain a finding of negligence on the part of George F. Horton individually, the court should have granted the motion for a new trial.

The undisputed evidence in the record establishes the following facts: Defendant George F. Horton, doing business in the firm name of Horton & Horton, was engaged in the construction of a sewer system in the city of Houston. The work was quite extensive, and he had a great many employés, who worked in gangs, each gang having a foreman. P. M. Hartley, representing himself to have had considerable experience in sewer construction, applied to defendant for work, and was employed by defendant and

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

placed as foreman over a gang that was excavating for a sewer at the intersection of Crosby and San Felipe streets in said city. His duties as foreman and the character of the work being performed under his direction, as told by the defendant in testifying, and his testimony is uncontradicted, were as follows:

"His, Hartley's, duties in that employment were to excavate and sheath that hole, his trench. I will describe in detail the work in one of those holes, so the jury will understand what kind of work it was, and the manner in which it was carried on. Mr. Hartley was excavating in what is known as an open cut or trench; he would dig it out, then sheet and go on down; it was just an ordinary trench right across the street, a big ditch; he sheeted and cross-sheeted all the way down in order to keep it from caving in; that was his work, and his duty was to excavate it, dig it out and sheet it. He had the help of his men in order to do that work * * * and at the time he met his death * * * had 12 to 14 men working under him at that work. Mr. Hartley himself had supervision and control over his men, absolutely, * * * and directed the details of the work of sheathing and bracing and the excavating that was going on in the place where he was working; he had full control, absolute charge. I held Mr. Hartley responsible for the safety of that work and for the sufficiency of it. The conditions, of course, were changing daily, or hourly, on that work. * * * You can readily see that a man excavating, he would go down, maybe, three to six feet in a day, it just depended on the digging and the number of men engaged, and the obstacles * * * that they met with, and of course they would sheet as they would dig out, going along, and the conditions were constantly changing down there every day then."

The extent of the sewer work in which defendant was then engaged covered a distance of about six blocks, and the work was divided into about five or six units, each unit having a foreman in charge, that in charge of the deceased being the one which caved in on him and caused his death; and each foreman was held responsible for the proper construction of the particular unit under his supervision. Defendant did not know the details of the work being done by deceased and his gang, except in a general way. On some days he would not visit the place and on others he would visit it two or three times a day, and on such occasions would ask the deceased as to the progress of his work and whether he needed anything. He was not present at the time of the cave-in, but had been there about 20 minutes before, and returned to the place about 20 or 30 minutes after the accident happened. He says:

"I know of my own knowledge that no timber broke in that cave-in; there was not a timber broken. I know that because I was there when it was being excavated."

The instructions given by defendant to deceased in regard to keeping sufficient material on hand at all times were, in the defendant's own language, "to see that there was always plenty of material on hand, order it ahead, keep plenty of material on hand, and in case of shortage to go to the teaming foreman and have him get it from any other place on the job—always have it there." At the time of deceased's employment the defendant told him:

"What I want is a man that can take charge of a piece of work and get results; what I want is results, and I want somebody that can get work out of men, and can sheath a hole"

—to which deceased replied:

"If there is anything I am good at it is sheathing. I worked for a railroad long enough to learn bracing, and while I was in Beaumont that was my duty; I had the night shift in Beaumont, and I excavated and sheathed the place, and in the daytime they built the sewer."

Being asked by defendant if he thought he could take the gang and excavate across San Felipe street and hold it, he said he did. The principal directions given to deceased by defendant were to "Sheath up, don't excavate too much before you sheath."

The excavation at San Felipe street crossing was to be carried to the depth of 32 feet and had reached a depth of about 20 feet when the cave-in occurred. The witness Fahr, one of the foremen of a gang working in another section of the sewer, testified: That he was present when the accident happened. That just immediately before it occurred deceased was standing on a ranger extending across the sewer about 12 or 15 feet from the surface—

"and he said: 'Fahr, pass me up a stiff leg, I want to put in a brace,' and I said, 'How are conditions down there, Mr. Hartley?' and he said, 'Conditions are all right,' and he says, 'I will put in a brace across here for precaution,' and I says, 'Well if there is anything dangerous let us know,' * * * and he said, 'If there was any danger here I wouldn't be in here, if there is any danger just come up, I can let you know in time so you can get up.' Well I never paid any more attention to him then, and went on with my work further down in the hole; and all of a sudden the crash came."

Brantley Monroe, who was working under the direction of the deceased, testified that when the cave-in occurred he was about 10 feet above the deceased and out of reach of the cave-in; that he had been within reach of it just before.

"How I happened to get out of there was, I saw the sand slip from the side, and I came out. Mr. Hartley called me down to him to bring him two pieces of five foot sheathing. Well I went on down to him, and just as I was going down I saw a little slip of sand, and I told him I didn't think it was necessary for us to stay down here; that I couldn't do him any good, and I came out, and he told me I was 'too darned scared; that the hole had done all it was going to do; that there was no danger.' I told Mr. Hartley I did not want to stay in there; I did that because I did not want to stay in there, as it looked dangerous to me, and I told him that; I got out, but Mr. Hartley stayed in it."

Philip Taylor, who at said time and place was working under deceased, testified:

"Mr. Hartley told me to go down there and get everything straight. I tried to get down there and save the hole in case it slipped, in getting in the braces as quick as we could. That was above where the accident happened, and the soil commenced slipping, and I got out of the way, up above, and Mr. Hartley came down and looked and said: 'All right; it is all

right, no danger; everything is all right.' And he says, 'Hand me that stiff leg down there,' * * * and he said, 'Come up and put it up,' and I said, 'No, sir,' and he called some man when I told him I was not going up there, and just as they got it [the brace] started across, why, it just crashed right in. The reason I got out was because it looked dangerous, was slipping down, and I didn't want to take any chances. Mr. Hartley, at that time, was trying to put that stiff leg across there. He said it was perfectly safe, but he was going to put the stiff leg across there so it would sure be safe."

Francisco Sanches, also an employé of defendant and working under the control of the deceased at the time of the accident, testified:

"Before it happened it was caving in, but I did not know it was falling in. I had told Mr. Hartley 10 minutes before that it was caving in. When I told him that Mr. Hartley told some negroes to bring him a stiff leg; he was going to place that stiff leg in that part that was caving in, so it would be stronger and to keep it from caving in. There was new lumber used there, and it was stronger, and he was going to put that there so it would be stronger. Mr. Hartley was up above when I told him it was going to cave in, he was standing on the side of the hole, outside. After that Mr. Hartley went down with this man to put this stiff leg in there."

Ed Needham had been superintendent of sewer construction, but about a week before the death of deceased he was relieved of this position and placed as foreman of a gang working at another place, occupying a position similar to that of deceased.

Rason was timekeeper and materialman for defendant, and was authorized by defendant to order such material as was needed in the progress of the work. If deceased or any other foreman wanted particular material, such as timber for bracing or lumber for sheathing, he would generally ask Rason for it, and the latter would then go to the warehouse to see what material was on hand, and if there was not enough there that he thought was needed, he would order it. He sometimes passed upon that question. He had held the position about seven months prior to the accident. Prior to his employment by defendant he had no experience in sewer construction, nor in passing upon lumber or timber or such questions, had never worked in a lumber yard and up to the time of the trial knew nothing about first or second class lumber, nor about the kind and quality of lumber that is needed to brace the side of an excavation 25 feet below the surface. He visited the place of accident shortly after the cave-in, and testified:

"I, myself, saw Hartley down in there and I saw the timbers all crushed in there and the dirt."

He further said:

"On the day of the accident to Mr. Hartley there was material on hand to be used for work in that particular hole; there was a good pile of that material there; there was a sufficient quantity, I believe. There was a quantity there of each kind used in the hole; it was close up so they could see it. If Mr. Hartley, in the usual course of things, came to me and told me that he did not have a certain kind of material, and I found that he did not have it, if he wanted it right away, I would go right near by to the other excavation there and get it. The occasion never arose where I failed to get material for him; I always got it for him. I do not know whether there was a request for material by Mr. Hartley on the day of this accident, I couldn't remember; there was none made to me. They very seldom had to make a request to me, because I always kept the stock up."

The witness Ed Needham, also a foreman, testified:

"My duties as foreman were to see that the work went on right, and handle the men to the best advantage to do the work, to see that it was timbered up and sheathed for the safety of the men, so as not to cave in, and to prevent any accident. I had all of the excavations to attend to; that is how far I was intrusted with the duty of attending to such work. I had also to attend to the sheathing after excavating, and that is how far I was intrusted with that work. It was entirely up to me to supervise the work of my men, and I was also intrusted with the duty of getting materials for that work."

John Needham, another foreman, testified:

"That work I was doing required sheathing and excavating; I had all that to do, the bracing and sheathing and all. I had a gang of men helping me, and my gang and I did that work. The extent of my duty toward supplying material was, if the material was not there, I gave orders to supply me with the material necessary. I directed the matters of placing the sheathing and bracing; that was left up to me completely; all of it left up to me, and that is true of all the other foremen, so far as I know. I did state that I ordered material. When I needed material, and couldn't find the superintendent, and the timekeeper came along, I ordered from him, either the timekeeper or superintendent; I would order from either. I would tell them I would need material."

The witness McElwee, who had many years experience in excavating and sewer construction, testified that:

"In my opinion, as a sewer foreman of six or seven years' experience, if that sewer had been properly braced and sheathed with a sufficient number of rangers and cross timbers of sufficient strength the sewer could not have caved."

It is undisputed that defendant did not go into the excavation in question to inspect it and see if the braces and sheathing were properly put in to prevent the sides caving, nor did he provide ladders for the men to climb in case of the happening of such an accident, nor did he station any one there to watch and warn Hartley and his men of impending danger from caving, nor did he inspect the timbers either before or after they were placed in the trench.

[1] This action is based upon the provisions of article 3017, Revised Statutes of 1895, which, in so far as applicable here, reads as follows:

"An action for actual damages on account of injuries causing the death of any person may be brought in the following cases: * * * 2nd. When the death of any person is caused by the wrongful act, negligence, unskillfulness or default of another."

It is now too well settled to require discussion, or to do more than cite some of the au-

thorities which so hold, that under this provision a person is not liable for the act or omission of his agents, causing death, but death must result from his own immediate act or omission. Sullivan-Sanford Lumber Co. v. Cooper, 105 Tex. 21, 142 S. W. 1168; Commerce Cotton Oil Co. v. Camp, 105 Tex. 130, 145 S. W. 902; Hargrave v. Vaughn, 82 Tex. 347, 18 S. W. 695; Hugo, Schmeltzer & Co. v. Paiz, 104 Tex. 563, 141 S. W. 518.

In order to authorize a recovery in this case it was incumbent upon the plaintiffs to prove that the death of P. M. Hartley resulted from some wrongful act, negligence, unskillfulness, or default of defendant Horton, or some agent representing him in the performance of some nondelegable duty. Has this been shown? We think not. Deceased had had considerable experience in doing the very work he was employed by Horton to do. In making application for employment he represented that he had been doing like work, that he understood bracing, and that if there was anything he was good at it was sheathing. It is manifest that the walls of the sewer caved for want of sufficient sheathing and bracing. It is further apparent, and it is made clear by the testimony of the witness, McElwee, that the sewer would not have caved had it been properly braced and sheathed with timbers of sufficient strength. If this was not done, was the omission due to the wrongful act, negligence, unskillfulness, or default of Horton, or his alter ego? We think not. As to those working under Hartley, he was, in the circumstances above detailed, the alter ego of Horton, and had any of them been killed by the cave-in an entirely different case would be before us. Here the excavation, sheathing, and bracing were under Hartley's direction, and the sufficiency of the props, supports, and the times for placing them in the trench were committed to Hartley's judgment. There is no evidence that he was not furnished with sufficient quantity of suitable material to make the work safe as it progressed, but, to the contrary, that such material was furnished to him. If the material was not on the ground he only had to apply for it in order to get it, but the testimony shows that a sufficient quantity was on the ground. He thought even up to the time that the earth fell upon him that the walls were sufficiently braced and sheathed to be safe, for this is what he told his employés when they refused to enter the sewer to assist him in putting in the additional brace. Whose fault was it, then, that the walls caved in? Certainly not the defendant's, for he had not reserved to himself the duty, in so far as Hartley was concerned, to see that the work was carried on properly, or of inspection, but all this was committed to Hartley. We are unable to perceive in what particular Horton was remiss in any duty he owed Hartley in the circumstances.

[2] The rule requiring the master to furnish the servant a safe place in which to work and holding him liable for injuries caused by a failure to perform such duty has no application under the facts of this case, for such rule does not apply to cases in which the work in which the servant is engaged is of such a nature that the conditions of the place of work are constantly changing. Adams v. Lignite Co., 138 S. W. 1178; Producers' Oil Co. v. Bush, 155 S. W. 1032; Labatt, Master & Servant, p. 2466. The work in its very nature was one of constant change. An excavation was being made, and progressed from three to six feet a day. The work was to be performed at the bottom of the trench, which grew deeper daily, and the sheathing and bracing had to progress with the excavation.

[3] If the place was an unsafe one in which to work, it was so because of the performance of the very work Hartley was employed to perform, and his failure to properly sheath and brace the sewer walls as the work progressed. There is not a scintilla of testimony to support the allegations that Horton neglected to furnish suitable material to properly sheath and support the sides of the sewer, but on the contrary the evidence is clear, we think, that the quantity and character of the timber necessary to be used was committed to the judgment of deceased, and that he was supplied with such material as he demanded. If it be contended that because the cave-in could not have occurred if the walls had been properly sheathed and braced with sufficiently strong material, therefore the caving itself showed that such material had not been used, and therefore had not been furnished to deceased, we think it is a clear answer to say that the evidence showing that deceased had the right to call for and procure suitable material, and that he always received such material as he asked for, the manner of doing the work having been committed to his supervision, his failure to use such material reflects more his want of judgment and experience than it does any neglect in that regard on the part of Horton. Nor is there merit in the claim that Horton was guilty of negligence in not properly inspecting the planking and cross timbers both before and after they were placed in the sewer. This was a matter especially committed to the deceased and a work which he undertook to supervise, and if there was negligence in this regard it was that of the deceased and not of the defendant.

It is not perceived how the failure of defendant to provide a ladder to be used by Hartley and his men, or the failure to station some person at the work to give notice of an impending cave-in, could have been the proximate cause of the death of Hartley. He was not killed because of a want of means of exit, but because after he was told of the danger of the earth's caving, he did not seek

to escape, but placed himself immediately where the caving earth would fall upon him in a laudable effort to prevent the very thing that happened, but there is nothing to indicate that had a ladder been provided he would or could have used it as a means of escape. A watchman, had one been provided, could not have given notice of conditions then existing that Hartley was not already aware of, not only from what the witness Sanches and other employés told him, but from his personal inspection. If it were conceded that the matter of furnishing suitable material had been delegated to an incompetent and inexperienced employé, this was not a proximate cause of Hartley's death, for the reason that it was nowhere shown by the evidence that deceased had not been furnished with suitable material, further than that the sheathing and braces gave way when the earth caved, the evidence showing that none of the timbers were broken. True the witness Rason says that he "saw the timbers all crushed in there and the dirt," but he did not say that the timbers were broken, and in the face of the positive testimony that none were broken, we cannot believe that the witness meant to convey any other idea than the language he used would imply that the dirt and timbers were crushed into the excavation by the cave-in.

In our view of the law as applied to the facts, we conclude that plaintiffs are not entitled to recover. We have reached this conclusion after mature deliberation and investigation of the authorities relied upon by the plaintiffs; and, while it is unfortunate that the plaintiffs may not be remunerated for the great loss sustained by them in the death of the husband and father, it appears to us that it is our plain duty to reverse the judgment of the court below in their favor, and to render judgment here for the defendant, and it has been so ordered.

Reversed and rendered.