## Eagle Coal Company v. Patrick's Administrator.

(Decided December 1, 1914.)

### Appeal from McCreary Circuit Court.

Master and Servant—Master's Liability for Injuries to Servant— Tools, Machinery, Appliances and Places for Work—Mines, Quarries and Excavations.—The duty to make safe the place where a coal-miner is at work may be imposed upon either the miner or the mine operator, by agreement or by custom; and where not fixed by agreement, it depends upon the custom in force in the mine at the time. This custom may be shown by witnesses who have proper qualifications to testify upon the subject. The safe place doctrine does not apply where the servant is engaged in work of such nature as to cause a constant change in the conditions as to safety of the place where he is at work; and extracting coal is a work of that kind.

O. H. WADDLE & SONS for appellant.

R. L. POPE, J. E. STEPHENS and W. F. HINKLE for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Reversing.

The evidence in this record is far from clear. It indirectly appears, from the evidence, that a drawing was made on the floor in front of the jury and used on the trial, but no map or drawing accompanies the record. As nearly as we have been able to determine the facts, they are substantially as follows:

Henry A. Patrick and one Loudermilk, coal miners, were engaged in the mine of the Eagle Coal Company, in extracting or mining coal, for the purpose of forming a passage from the air-course to a room on the left thereof. The passage so being formed, it seems, was about eight or ten feet wide, though there is no direct evidence on this point. How far it had penetrated from the air-course we are unable to ascertain from the record. The miners were preparing to shoot down a

block of coal, when a mass of the room-formation fell upon Patrick, causing injuries from which he soon died.

His administrator instituted this action in the Mc-Creary Circuit Court against the coal company to recover damages for his death; the jury returned a verdict in plaintiff's favor in the sum of $2,750; and the coal company appeals.

The only witness introduced, bearing on the question of how or the condition of the place where the accident happened, was John Lynch, and his entire testimony on that subject is as follows:

"He was killed right in the head in the face of the coal * * Right against the face of the coal * * The best I remember about it, it was a little after ten o'clock when the rock fell on him. * * My job was to trap this door and to fire this furnace. I was inside. I was sitting at the mouth of this (indicating) on a can. They shot at any time they got their hole ready, and when they would come around here in the room where they kept the powder and made the powder, I would go and fix the fire; and when they would fire their shot they would go up the entry and I would go out at the door to keep any one from passing when he would go in there to dynamite the shot. It is there yet, I reckon. I went and fixed my fire, and came back here (indicating) and I stayed there until he tamped the hole. Q. That is, Patrick? A. Yes. Loudermilk was here in the corner putting in the stuff with a pick; after he got his hole tamped I started to go back, and just as I set down and blowed out my light, just as I set down I heard the rock fall, and Loudermilk hollered, and I jumped and run back; when I got there, they had called in a lot of the day hands. I cotch my lamp and lit it and went in where he was. I found him laying under the rock, his body, with his head out. Q. Tell the jury how big a block of slate that was that fell on this man and mashed him up? A. It was a big rock. Q. Tell the jury how much you think it would weigh? A. Several thousand pounds. Q. About how long was it? A. about ten or twelve feet long. Part had broken off. I could not tell you about how long the whole business of it was, but the little piece I expect was some ten or twelve feet long. * * * That part that broke off put to it, it might have been something like fifteen feet long, all of it. Q. What was done with him? A. When Loudermilk hollered for me and I went in there, he had a feed bar or something under the slate and I went in there and

grabbed hold of this feed bar and we lifted. I did with all the strength I had, and we never moved the rock. I then went out and hollered for help. They did not put in any shot that day. They had shot the day before.''

Loudermilk did not testify; and it will be seen from the preceding quotation that there is but little evidence to explain how and why the fall of the roof occurred. It will be seen that the piece of rock or slate which fell on Patrick was ten to fifteen feet long, possibly longer; but whether it fell entirely from the roof of the passage where he was working, or whether it extended out into the air-course, is not shown. Whether any attempt had been made by Patrick and Loudermilk, or anyone else, to support the roof from which it fell is also a matter of uncertainty; as there is no evidence on this question.

Under the pleadings and proof produced, the issue was: Whose duty was it to make safe the roof of the place where Patrick was working at the time he was killed.

This duty is not fixed by law. It is a duty which, by agreement or by custom, may be imposed upon either the miner or the mine operator. Old Diamond Coal Company v. Denny, 160 Ky., 554. Where it is not fixed by agreement between the miner and the operator, it depends upon the rule or custom in force at the time of the injury; and this rule or custom may be shown by witnesses who exhibit sufficient and proper qualifications, knowledge and ability to testify as to what the rule or custom was in that respect.

The duty to make safe the place where the miner is extracting coal, being a duty not fixed by law, but by the mining contract, or, in the absence of a contract, by the rule or custom in force in the mine at the time, it is possible for the respective duties of the miner and the mine operator to vary in different mines.

Generally speaking, however, the making safe of the miner's working place, i. e., the place where he is extracting coal, may be divided into three duties: (1) the duty of examining the roof and of determining when protection must be provided against possible falling of the roof, and whether ordinary props will be sufficient protection, or whether timbering is necessary; (2) the duty of placing the props in position, when ordinary props have been deemed sufficient protection; (3) the duty of timbering the place when ordinary props have been deemed insufficient protection. By ''prop'' is meant an

upright post surmounted by a square block wedged between the top of the post and the roof. Big Branch Coal Company v. Wrenchie, 160 Ky., 668. By "timbering" is meant the protecting against falls of the roof formation, by means of horizontal timbers or caps extending across the passage-way just under the roof, the ends of such timbers resting upon vertical timbers or posts.

In establishing the controlling fact, i. e., whose duty was it to make safe the roof of the mine at the time and place where it fell, a number of questions present themselves.

Was it the miner's duty to examine the roof and determine whether props were needed? If so, after such determination was made, was it his duty to set the props in position, or merely to notify the mine foreman, whose duty it thereupon became to have them placed in position? If it was the miner's duty to set the props in position, what was his duty in the event his examination developed the fact that props would probably be issufficient protection, and that the place should be timbered? Was it then his duty to do the timbering, or merely to notify the mine foreman, whose duty it thereupon became to cause the place to be timbered? Was the roof supported by props when it fell? If not, were there any props available at the place for use? If not, had proper request been made for props, and had the mine operator failed to supply them? These and like questions are those which arise when a miner has been injured by the fall of slate or rock from the roof of the place where he is at work; but they all tend to elicit and establish the one controlling fact, i. e., whose duty was it to make safe the roof of the place where the miner was working at the time he was injured by the fall of rock or slate therefrom? And this is a question of fact, unless the evidence is uncontradictory.

There is some evidence in the record that, under the custom of this mine, it was Patrick's duty to look after the roof of the place where he was working; that if it could be made safe by ordinary propping, it was his duty to prop it; but that if he discovered a defect of such nature that the roof could not be made safe by ordinary propping, it was then his duty to notify the mine foreman, whose duty it thereupon became to cause the place to be timbered by the regular timbering crew.

There is likewise some evidence in the record that, according to the custom of the mine, it was the duty of

the mine operator to look after the roof of the place where Patrick was working, and to cause Patrick to prop the roof if propping was necessary. But the evidence, aside from being conflicting, is not satisfactory either way; and, apparently, none of the witnesses qualified themselves in proper manner as should have been required of them before they were allowed to testify upon the subject.

There were also introduced in evidence certain rules, as they are called, said to have been promulgated by the coal company, among which is one requiring miners to keep their working places properly timbered, the company undertaking to furnish the necessary materials therefor. But it was not shown where these rules were posted, or for how long a period, or what opportunities Patrick had for becoming charged with notice thereof. But, even if he had notice thereof, still rules are not conclusive evidence of the terms of the contract of employment or of the custom of the mine, for rules may be abrogated by failure to enforce obedience thereto, or they may be waived by the mine operator departing therefrom in the conduct of the operation. The evidence is, therefore, also unsatisfactory as to the effect that should be given the rules so introduced in evidence.

2. In Instruction No. 1, the court instructed the jury that it was the duty of the coal company to furnish Patrick a reasonably safe place in which to work. This was error. The "safe place" doctrine does not apply, as a general rule, where the perils to which the servant is subjected are of his own creation, and where, as a result of the servant's work, the character of the place is constantly changing; and extracting coal is a work of that kind. Wallsend Coal & Coke Company v. Shields' Admr., 159 Ky., 644, 167 S. W., 918.

3. The court, in the same instruction, also told the jury that it was the duty of the coal company to use ordinary care in inspecting the roof of the place where Patrick was at work. This was likewise error. By the contract of hiring or by mutual understanding or custom, in the absence of a statute, the burden of making such inspection of the working place as the servant is qualified to make, may be imposed upon the servant. Buey v. Chess, 84 S. W., 563, 27 R., 198; Old Diamond Coal Company v. Denny, 160 Ky., 554; Borderland Coal Company v. Small, Admr., 160 Ky., 738.

The evidence as to whose duty it was to inspect the roof of the place where Patrick was at work was conflicting, and because conflicting, it was for the jury. And it was error to instruct the jury, as a matter of law, that such duty devolved upon the coal company. Duncan Coal Company v. Thompson's Admr., 157 Ky., 304.

4. The court also instructed the jury in instruction No. 5 that it was Patrick's duty to inspect the roof of his working place. Appellant complains of this upon the ground that this instruction and instruction No. 1 are in conflict; and that the two instructions, one instructing the jury, as a matter of law, that it was the company's duty to inspect the roof of Patrick's working place, and the other instructing the jury, as a matter of law, that it was Patrick's duty to do so, were confusing to the jury and, therefore, prejudicial.

The instruction complained of was erroneous both because the evidence as to Patrick's duty in the respect mentioned was conflicting; and also because the instruction was in direct conflict with instruction No. 1. However, although erroneous and confusing to the jury, we do not think it was prejudicial to appellant.

But because of the other errors indicated, the judgment is reversed.