## CHISOS MINING CO. v. HERNANDEZ
### et ux.
### No. 3375.

Court of Civil Appeals of Texas. El Paso.
June 4, 1936.

Rehearing Denied July 30, 1936.

Mead & Metcalfe, of Marfa, and W. Van Sickle, of Alpine, for appellant.

Earp & Owens and Frank O. Ray, all of Alpine (Joseph G. Bennis, of El Paso, on the brief), for appellee.

WALTHALL, Justice.

On May 10, 1933, Cipriano Hernandez was employed as a laborer in the coal mine of the Chisos Mining Company in Brewster county, Tex., and while so working a rock or stone alleged to be approximately 5 feet in length, 2 feet in width, 12 inches thick, fell from the roof of the mine room in which Cipriano Hernandez was working, and upon him, injuring him, from which injuries he shortly thereafter died.

This suit was brought by Guadalupe Hernandez and Terresa Hernandez, father and mother, respectively, of Cipriano, as plaintiffs, to recover of the Chisos Mining Company, as defendant, the present value of the financial assistance and pecuniary contributions which the son might have made to them both before and after he became 21 years of age, stating the amount of money they reasonably expected to receive from their son during his minority and the amount they reasonably expected to receive during his majority, had he lived.

At the time of his death Cipriano is alleged to have been 17 years of age, strong and healthy, well able and qualified to perform, and did perform, average and customary labor required of a laboring man, and at the time of his death was employed by defendant and received $1 a day, and that in ordinary times not influenced by depression his services were reasonably worth $2.40 per day; that plaintiffs are about 41 years of age, are the parents of several minor children residing with plaintiffs, and are largely dependent upon plaintiffs for support; that Cipriano, out of his love and affection for plaintiff, could and would contribute substantial sums of money to the support of plaintiffs before and after reaching his majority.

Plaintiffs assign as acts of negligence on the part of defendant as causing, or contributing to cause, the injury and death of their son substantially as submitted by

the trial court to the jury on special issues and on which the jury made findings.

The jury found substantially all of the facts submitted in favor of plaintiffs, upon which findings the court on plaintiffs' motion entered judgment for plaintiffs in the sum of $2,500. The court overruled defendant's motion for a new trial, and defendants appeal.

### Opinion.

After defining certain terms used in the charge, the court instructed the jury: "You are further instructed that it was the duty of the defendant to use ordinary care to provide the deceased Cipriano Hernandez, a safe place in which to work and a failure to use such care would, in law, be negligence."

Following the above instruction the court submitted to the jury the issues of fact substantially as follows:

1. Whether "defendant failed to supply a skilled foreman to properly prop and support the roof and walls of the mine in which the deceased, Cipriano Hernandez, worked."

2. If answered yes, was such failure negligence? and,

3. Was such negligence, if any, the proximate cause of the injury and death of the deceased?

Issues 4, 5, and 6: Did the defendant fail to provide an underground foreman? Was such failure, if any, negligence, and the proximate cause of the injury and death of the deceased?

The jury answered the above three issues "Yes."

Issues 7, 8, and 9: Whether defendant failed to properly prop and support the roof and walls of the mine in which deceased worked, and was such failure, if any, negligence, and a proximate cause of the injury and death of the deceased?

The jury answered the above three issues "Yes."

Issues 10, 11, and 12: Whether defendant failed to furnish proper timbers with which to safely and properly support and prop the roofs and walls of the mine in which deceased worked, and was such failure, if any, negligence, and a proximate cause of the injury and death of the deceased?

The jury answered "Yes" to the above three issues.

Issues 13, 14, 15, and 16: Was the mine room in which the deceased was working at the time of his injury a dangerous and unsafe place in which to work, and, if yes, did defendant's foreman, Joe White, know of its dangerous and unsafe condition, and, if Joe White did know of its dangerous and unsafe condition, did he negligently direct deceased to go into said mine room to work, and was such negligence, if any, a proximate cause of the injury and death of deceased?

The jury answered the above four inquiries, "Yes."

Issue 17: The jury found death of the deceased was not the direct and proximate cause of an unavoidable accident.

The court then instructed the jury that, if they found the defendant guilty of negligence under any of the foregoing special issues and that such negligence was a proximate cause of the injury and death of the deceased, in that event to answer the following:

Issue 18: What sum do you find from the preponderance of the evidence will compensate the plaintiffs, the parents of the deceased, naming them, for the actual pecuniary loss suffered by them as the direct and proximate result of the death of their said son?

In determining their answer under issue No. 18, the jury was instructed that plaintiffs would be entitled to recover, if at all, such an amount as, if paid now, would compensate them for the pecuniary loss, if any, of their son's services, if any, from the date of his death until he would have arrived at the age of 21 years, and in addition thereto such an amount, if paid now, would compensate them for such pecuniary contribution, if any, as they might reasonably expect to receive from their said son during the remainder of his life after reaching 21 years of age, but that the jury would not consider any bereavement, mental anguish or pain, suffered by plaintiffs on account of the death of their son; the damages, if any, are for pecuniary loss, if any, and not a solace.

Appellant submits that it was reversible error to charge the jury, as a matter of law, that it was the duty of the defendant to use ordinary care to provide the deceased a safe place to work, and that a failure to use such care would, in law, be negligence, for the reason that the uncontroverted evidence showed, and as

pleaded by defendant, that the place where the deceased was injured was a place constantly undergoing change by reason of the character of the work the deceased was engaged in; or at least the evidence was conflicting on that issue. It is also submitted that the charge is upon the weight of the evidence, in that it assumes that it was defendant's duty to make the place safe. Defendant plead that the deceased, at the time he was injured, was engaged in smoothing the top or roof of the room in which he was working, and smoothing the wall or face of the coal in the room preparatory to placing another prop before setting off another blast; that, by reason of the character of the work then being done, the place where deceased was working at the time he was injured was constantly changing; that it was the duty and custom of the men working as the deceased was at the time of his injury to examine the roof or ceiling of the room for loose rock that might fall, before standing or working under the roof; and that by ordinary care deceased could have seen and known of the condition of the roof of the mine room, and could and should have jarred loose the rock that fell and injured him.

The record contains much evidence on the point presented, and we briefly state portions of it which we think are pertinent to the point under consideration.

Silvester Ramirez, a witness for plaintiffs, testified: Was working in an adjoining mine room to that of deceased at the time of the injury, and about 30 feet distant; was in deceased's mine room the day before the injury and observed the roof in that room; the ceiling was bad, it looked like it was falling in a place about 5 feet; the room was about 12 feet wide.

"Question: How far, in feet, was it, about from where the last post was set to the face of the mine? Answer: Two or three feet was the distance.

"Question: How far were the posts set apart? Answer: About two feet.

"Question: Then how far was it from the last post back to the face of the mine (wall) where they blasted? Answer: Two, two and a half or three feet."

Witness said he saw Joe White (mine foreman) in the mine room of deceased the day before the injury. Heard deceased tell Joe White "they were short some timbers." Joe White said: "He had sent for some timbers from the mine but they didn't furnish them." Witness said Joe White did not go in the mining room on the morning of the injury. Cipriano was injured about 9 o'clock in the morning. Jesus Cisneros was underground foreman; he put up timbers; he was not there that day; when Cisneros was not there, witness said "sometimes, me and sometimes Cipriano and sometimes Celso (Martinez) did that work." On the morning Cipriano was injured Joe White told him to "go in and face the front of the coal, the front of the wall of the room in which he was working." Witness said deceased had been working in the mine several months before he was injured. There was a row of posts through the middle of the room all the way from the tunnel with a cap on each post. Witness went in the room after a pick before deceased was injured and deceased was smoothing the face of the wall with a pick and was standing under the loose rock up there picking with a pick on the face of the coal. Joe White told him to work that way. Witness had done the same kind of work, but looked at the ceiling before going under it to see if there was any loose rock up there; if there was any loose rock, witness would take them out with a pick or crowbar and then go; in taking out the loose rock witness would get out to one side; no one would tell me to stand to one side, witness would do that himself. The rock fell down between the last post and the face of the coal. Witness knew the rock that fell.

"Question: Joe White told all of you men that when you saw any dangerous place to let him know, didn't he? Answer: Yes, we were to tell him, and then he would tell us to put timbers and there wasn't timbers.

"Question: Joe White told you that if it looked dangerous where you were at work, not to work there, didn't he? Answer: He told us to work, but there wasn't any timber, we would have to work that way. He told us to always work, that there was no remedy, they had to have the coal."

Witness said he knew there were no posts not in use at the coal mine. It was no part of the duty of the deceased to put up the poles. The deceased and Marcus Scott were smoothing the face of the coal and top to fix it so another prop could be put in; witness said that was the customary way; if there are any rocks loose

on top, it was the custom for them to knock them down before they put a prop under it.

Several witnesses, workmen in and about the mine, testified substantially as did Ramirez.

Joe White, the foreman at the coal mine, testified:

"There is a main tunnel that runs from the surface into the mine, and from that tunnel three rooms eight or ten feet wide from which the coal is extracted. The space between the rooms is about eight or ten feet. The rooms are from eight to ten feet wide; the coal is knocked down by shots, by drilling; props are put up and caps on the props to support the roof; in ten foot rooms props are put in rooms about three feet apart; in eight foot rooms one row of props is used and put in the center; one row of props was used in the room where the deceased, Cipriano, was killed; the room was about twenty feet in length; the props were about 2½ or 3 feet apart, the caps were from two to four feet long. A row of props and caps are down the middle of the room, witness said, after a blast we take the coal out and then we either pick the room or the face, if there is anything loose after the round of shots and then if the vein is not high enough, we put in a couple of pop shots in there and break it down and pick it down to put another prop and cap in to take care of the roof."

"Question: About how close would you set these props to the face of the coal? Answer: Mostly about two or three feet from the face.

"Question: Why do you leave that much space between the props and the face of the coal? Answer: They have to have room to work in."

The witness said to put the props closer the blasts would blow the posts away. The witness then stated the manner of drilling and taking out the coal, and said, if there is any loose stuff on the face or roof, "we pick that down to put another set of posts and cap in."

"Question: About how much space is there between the last prop and the face of the coal, after you have cleaned out the coal and smoothed the face? Answer: Sometimes up to four feet but very seldom is there more than that.

"Question: About how much coal is knocked down at a shot? Answer: About 2, 2½ or 3 feet."

There is much evidence of the same general character as above by White and other witnesses. Apparently there were no measurements taken of any of the things about which the witnesses testified, and especially is that noticeable as to the exact place from which the rock fell that killed the deceased, its height above the floor of the room, whether the room was light or dark so that the rock and the conditions surrounding it could be seen and appreciated by the deceased. The timbering in parts of the room other than at the place from where the rock fell, about which there was much testimony, seem not so important, since that contributed nothing to the falling of the rock that killed the deceased. It is made to appear, however, that the place where deceased was working at the time he was killed was changed by the constant drilling and blasting of the wall. And that presents the question submitted: Was it the duty of the master under such conditions, as a matter of law, as expressed in charge complained of, to use ordinary care to furnish Cipriano, the servant, a safe place in which to do the work he was then doing, and that a failure to use such care would, in law, be negligence? The evidence shows that the rock in the roof of the room was caused to fall by the picking or smoothing either of the roof or the wall of the room preparatory to the placing of another prop and cap in the roof.

It seems to be well established that the general rule that the master must exercise ordinary care to furnish his servant a reasonably safe place to work has no application where the place becomes unsafe during the progress of the work. The rule is well illustrated in the case of Adams v. Consumers' Lignite Co. (Tex. Civ.App.) 138 S.W. 1178, 1179 (writ refused), in which it is said: "In such case 'the hazards arising as the work proceeds are regarded as being the ordinary dangers of the employment, and by his acceptance of the employment the servant necessarily assumes them.' [Galveston, H. & S. A.] Railway Co. v. Hansen [58 Tex. Civ.App. 584], 125 S.W. 63. Mr. Labatt in his work on Master and Servant, § 588, after referring to the rule as it is expressed by the court of Massachusetts, says: 'One special application of the general conception underlying the rule stated in the preceding section is that where the work is of such a character that, as it progresses, the environment of the servant must neces-

sarily undergo frequent changes, the master is not bound to protect the servant engaged in its employ against the dangers resulting from those changes.' Armour & Co. v. Dumas, 43 Tex.Civ.App. 36, 95 S.W. 710; Allen v. Railway Co., 14 Tex.Civ.App. 344, 37 S.W. 171; Smith v. North Jellico Coal Co., 131 Ky. 196, 114 S.W. 785, 28 L. R.A.(N.S.) 1266."

■ Several of plaintiff's witnesses testified as to the condition of the roof before the rock fell; that it was ugly; that about five.feet "looked as if it was falling"; "it was open on one side." The undisputed evidence shows the deceased knew of and appreciated the danger of rocks falling from the roof, and of the particular rock that did fall. It is apparent from the evidence that the rock that fell was between the nearest prop and cap and the wall and lay crosswise of the room. In the case from which we have quoted it is said it was not incumbent upon the defendant to stand by during the progress of the work to inspect and see when a danger arose and give warning of it or otherwise protect the servant from it, and especially would that be so where the servant knows of the danger and can protect himself against it.

In Eagle Coal Co. v. Patrick's Administrator, 161 Ky. 333, 170 S.W. 960, 962, a Kentucky case, the miners were preparing to shoot down a block of coal when a mass of the room formation fell upon Patrick, causing injuries from which he soon died. The suit was by the administrator to recover damages for his death. Whether the rock entirely from the roof .of the passage fell on Patrick and killed him was uncertain. But under the pleadings and proof the issue was: Whose duty was it to make safe the roof of the place where Patrick was working, at the time he was killed? In·that case the trial court instructed the jury, as in the instant case, that it was the duty of the coal company to furnish Patrick a reasonably safe place in which to work. The appellate court said: "This was error. The 'safe place' doctrine does not apply as a general rule, where the perils to which the servant is subjected are of his own creation, and where, as a result of the servant's work, the character of the place is constantly changing; and extracting coal is a work of that kind."

We have reviewed many other cases to which we refer without quoting therefrom:

Wallsend Coal & Coke Co. v. Shields' Adm'r, 159 Ky. 644, 167 S.W. 918; Producers' Oil Co. v. Bush (Tex.Civ.App.) 155 S.W. 1032; Horton & Horton v. Hartley (Tex.Civ.App.) 170 S.W. 1046, 1050; Saxton Coal Co. v. Kreutzer's Adm'x, 202 Ky. 387, 259 S.W. 1022; Hailey v. Missouri, K. & T. Ry. Co. (Tex.Civ.App.) 70 S.W.(2d) 249.

We have concluded that the charge complained of constitutes reversible error.

We have concluded, also,. that remarks of one of counsel for plaintiff in his argument to the jury presents reversible error. It is true the court instructed the jury not to consider the remarks, but the instructions of the court do not and cannot remove harmful impressions once made.

Now, assuming that what we have said as to the "safe place" rule does not apply to the place where the deceased was at work at the time of his injury and death, in view of another trial, we venture suggestions on some other features of the trial.

The evidence shows without controversy that there was an unprotected space between the last prop and cap and the face of the wall, a space estimated by various witnesses to be from 2 to 6 feet in width. It was from that space that the rock fell. It was in that space that the deceased was working, smoothing the surface of the roof·or wall, or both, at the time the rock. fell. The evidence further tends to show that the superintendent, Joe White, had been informed that there was a seam in the roof in that space; that the roof of the room was ugly because of the conditions stated. The evidence shows that the deceased knew the condition of the roof.

"Question: What on that occasion did Cipriano say to Joe White, if anything? Answer: He .said it was all right but it was ugly in there."

The evidence tends to show Cipriano made a request of Joe White for timbers and that Joe White told him there were none. The evidence shows that the deceased thereafter went to work in the unprotected space, and while working· was killed by the falling rock.

■ Defendant, complains of the charges 13, 14, 15, and 16, submitting whether the mine room in which the deceased was working was a dangerous and unsafe place, whether Joe White knew it was un-

---

safe, and negligently directed deceased to work in the room, and was such negligence the proximate cause of the death of deceased.

We think the question presented is controlled by the safe place rule above discussed. The evidence does not show that the deceased went to work in the unsafe place under any promise that the place would be made safe.

Defendant pleaded, and the evidence tended to show, that defendant was operating the mine according to the usual and standard custom, and the rule seems to be that, before plaintiffs can recover, it devolves upon them to show that such custom is negligence. Taylor v. White (Tex.Com.App.) 212 S.W. 656; Cameron Compress Co. v. Whitington (Tex.Com. App.) 280 S.W. 527.

For reasons stated, the case is reversed and remanded.