## Big Branch Coal Company v. Wrenchie.

(Decided November 5, 1914.)

'Appeal from Pike Circuit Court.

1. Mines—Section 2739b, Subsection 7, Ky. Stats.—Where the use of headers is customary or necessary in propping the roof of a mine, the mine owner should supply them in order to comply with section 2739b, subsection 7 of the Kentucky Statutes.

2. Mines—Assumption of Risk.—Where the miner was under contract to dig the coal and take care of the slate, and the company was to furnish props, headers, etc., the miner did not assume the

risk of falling slate that seemed sound, where the company had failed to furnish headers as requested.

AUXIER, HARMAN & FRANCIS for appellant.

ROSCOE VANOVER for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

The appellee, William Wrenchie, while digging coal in appellant's mine, was injured by a fall of slate. His spinal column was injured, and he was paralyzed from his hips down. He is unable to turn himself in bed, and it is not disputed that he is a cripple for life. He sued to recover $3,000, and on a trial of the case the jury awarded him $1,000. All the witnesses heard in the case were introduced by the appellee, and, at the conclusion of their testimony, the coal company asked for a peremptory instruction. The refusal of the court to give this is the sole ground urged for reversal. The instructions which the court gave are not criticised and there is no suggestion that the verdict is excessive. The evidence discloses about the following state of facts, the sufficiency of which to sustain the verdict is the only matter necessary to consider.

Appellee, with his "buddie," or partner, who were experienced miners, had a contract to drive a "neck" to room No. 9, and a "breakthrough" between the necks of Nos. 9 and 10. The neck of the room is driven through the coal from a cross entry, in this case, a distance of some 40 feet from the cross entry. The neck is driven narrow, or just wide enough to allow a car track into the room, from which this neck is the outlet for the coal, as mined, to the cross entry. The proof does not show for what purpose the breakthrough was being driven between the necks of 9 and 10, but evidently it was for an airway and, therefore, was made narrow, but, as it was not to be used for a track or haulway, upright props would be placed at irregular distances, and only when necessary to support the slate roof. In driving a neck or haulway, care is exercised not to put the upright props in places to interfere with the track to be laid. In other words, they are placed at regular distances on each side of, and so as to leave room for the track. Because of the extra space between the props on each side of the track, headers or pieces of plank six or more feet long are placed flat against the roof so as to reach

from one post to another across the track, where the condition of the roof seems to require it.

It is also in evidence that when starting a room neck out from an entry, or a breakthrough out from the neck, it is customary to place a header across the new opening supported by a post on each side. In this way, a workman with his cutting machine situated on the track in the entry or neck, the roof of which is already secured with props, is protected from a fall of slate in the new excavation. In other words, if slate does fall from the new work before all the coal is taken out and props put in place, the fall will in no event extend further back than the header which has been placed crosswise of the new opening, and will not reach the workman with his machine on the other side of the header.

Appellee and Williams were doing this work under a contract whereby they were to receive 45c per ton for all the coal mined and the company was to furnish "the props, caps, headers and timbers necessary to prop up the roof of the mine." These men were to lay their own track, and with the props and timbers so furnished were to support the roof and handle their own slate, that is, if slate should fall before it could be propped, or if it should be so loose as to make it advisable to take it down rather than prop it up, then they were to take it down from the roof and dispose of it. For more than two weeks, they had been engaged in driving this room neck, and, as above stated, they had driven it about 40 feet, and laid the car track from the entry back to the face of the coal. Under direction of the bank boss, they had started to drive the breakthrough. Two weeks before the accident, they had called upon the superintendent for headers as well as props and caps. Nothing but props and caps were furnished them. Wrenchie says the bank boss said he would send in headers, and, as he swears, he reminded him of this every time he saw him afterwards, and this was every day or so. The day before the accident, he saw him and made the request and on the day of the accident he had asked the driver to bring him headers. At no time was there any intimation that the headers would not be furnished, or that there would be any delay about it. Notwithstanding the failure to furnish headers, work in the room neck was continued, for, as they swear, they examined the roof repeatedly, and it "sounded" good, and nothing but props and caps, placed on each side of the track, were used to

support it. They especially desired a header to go across the breakthrough which they were starting. On the next day after this last request of the bank boss for headers, and when the breakthrough had been driven about five feet, a large piece of slate fell, beginning back in the roof of the breakthrough and extending out into the roof of the neck so that it fell upon Wrenchie, who was sitting on his machine cutter on the car track in the room neck, and in this way he received the injuries described.

Wrenchie swears if this header had been furnished him he would have placed it across the head of the breakthrough, and other witnesses corroborate him in the statement that a header so placed would have prevented the falling slate extending into the roof of the neck where he worked. In other words, he would not have been injured if the headers had been furnished,

It is insisted that the mere failure to furnish headers, as requested, does not indicate that the company has violated the provisions of section 2739b, sub-section 7, where it says that:

"The owner or operator of every mine to which the mining laws of the State apply, shall provide and furnish to the miners employed in said mine a sufficient number of caps and props, * * *."

In other words, it is argued that headers are not included within the materials which the law requires to be furnished, and that when caps and props have been furnished, the legal duty has been performed.

From the proof, we understand that props are upright posts wedged between the roof and the floor to support the roof, and that a cap is a square piece of plank, or block wedged between the top of posts and the roof to better hold the roof. Headers are longer pieces of plank extending over more of the roof and supported by two props, one at each end. By their use, a larger area of roof can be held secure with fewer posts. We conclude that headers, serving the purpose of a cap, and their use being customary and frequently necessary, are embraced within the materials named in the statute. If there was any doubt about the statute, the contract proven in this case specifies headers and is conclusive of the question.

It is further argued that, notwithstanding the failure of the company to furnish headers, the appellee assumed all the risk of falling slate. This argument is

based upon the terms of his mining contract, above referred to, whereby he was to receive 45c per ton for coal mined and loaded, and was to be furnished all necessary props, caps and headers. He was to set the props, caps and headers as needed, and take care of all his slate. The meaning of this contract was that he should take down all slate that was proper or necessary to come down. This necessity would only arise as he might find the roof so bad as to make it unsafe or inadvisable to work under it, even if propped up, or attempted to be secured. In other words, wherever he might find the slate in such condition as to make it unsafe to leave it, although propped, then he should take it down.

In this neck and breakthrough the proof shows there was no necessity for taking down any slate for any purpose. It does not appear that any needed to be taken down in order to make room for a haulway. In view of the fact that the slate at this place when examined by Wrenchie seemed to be sound, and nothing to indicate it was about to fall, or would fall before the promised props and headers were supplied, it was not incumbent upon him to attempt to take it down, and, therefore, we can not say that either under his contract or the statute he assumed the risk of its falling before the headers were furnished.

There is nothing in the proof to show that he was guilty of contributory negligence. Such examination as the men could make of the roof indicated that it was not loose, and with the expectation of receiving headers so that it could be made secure before it became loose, he was not negligent or careless in continuing work, and it can not be said that he assumed the risk of this injury when he was expecting and had a right to expect that the headers would be furnished, so that he could place them before the roof became loose or dangerous.

The instructions were much more favorable to appellant than there was need for. For instance, the jury were told that, if appellee had requested headers two weeks before that time, then two weeks was too long to wait for them, and that if he continued at work after a failure to furnish them for that length of time, he assumed all the risk, and if he was then injured, he had no cause of action. This was clearly erroneous and prejudicial to appellee, and the wonder is that the jury found a verdict for him at all, because the proof showed beyond a doubt, that request had been made for headers

two weeks before; in fact, there is no denial of the averment in the petition that headers had been requested, and there had been a failure to furnish them. The court in its instructions, and the appellant in its brief evidently overlooked the proof showing that these requests for headers were repeated almost every day, even the day before, and on the day of the accident, and there was no intimation from any source that there would be delay or failure to furnish them. The principle is well illustrated in the case of Majestic Collieries Co. v. McCoy, 132 Ky., 533:

"Appellant contends that the proximate cause of appellee's injury was his failure to prop his roof, or to inspect it after he had shot the blast of coal from the face of the room where the roof fell. As to the first proposition, appellee testified, as did his brother, who was working with him, that he had for several days been requesting the mine foreman to send them props, but he failed to do so. The foreman admits the request, but not as frequently as appellee claims it was, and excused his failure by saying he had directed another employe to bring in the posts; also that there were some posts lying near, about 50 or 60 feet away, which appellee might have used. Appellee says that the last named posts were too long. The danger from the lack of suitable posts was actual, but not so apparent or imminent as to make it rash for one to work as appellee was doing without them. He was tempted to and did use his posts sparingly, as he had to lose his own time in pulling them from an abandoned part of the mine. It was just such temptation and hazard that miners will let themselves be subjected to that the statute was evidently aimed to prevent. The miner does not assume the risk unless obviously perilous, &c."

We are impressed that the failure to furnish headers was the proximate cause of the injury, and that appellee did not assume the risk of danger in continuing to work in the expectation that they would be supplied, when the roof seemed safe and the peril was not obvious.

The judgment of the lower court is, therefore, affirmed.